Frederick ASHMORE, David Boya, William Simone, and Richard Simeone, Plaintiffs,

v.

NORTHEAST PETROLEUM DIVISION OF CARGILL, INC., Northeast Petroleum Corporation of Maine, Northeast Petroleum Corporation of Cape Cod, d/b/a Northeast Petroleum, and Cargill, Inc., Defendants.

Civ. No. 93–199–P–C.

United States District Court, D. Maine.

Jan. 19, 1994.

Daniel W. Bates, Kenneth D. Keating, Petruccelli & Martin, Portland, ME, for plaintiffs.

John J. O'Leary Jr., Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, Chriss B. Wetherington, Bernhardt K. Wruble, Verner, Liipfer, Bernard, McPherson & Hand, Washington, DC, for defendants.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS

GENE CARTER, Chief Judge.

This action was commenced by Plaintiffs Frederick Ashmore, David Boya, William Si-

mone, and Richard Simeone alleging that they were dismissed from employment as sales representatives for Defendants[1] in retaliation for Plaintiffs' refusal to implement a pricing system which allegedly violated the Robinson–Patman Antidiscrimination Act of 1936.[2] 15 U.S.C. §§ 13, 13(a), and 22. The Complaint states five causes of action. In Count I, Plaintiffs seek treble damages for injury sustained due to violation of the Robinson–Patman Act in accordance with Section 4 of the Clayton Act. 15 U.S.C. § 15. Complaint (Docket No. 1) ¶¶ 12–37. Counts II, III, IV, and V state claims based on breach of contract, promissory estoppel, breach of implied duty of fair dealing, and tortious termination in violation of public policy, respectively. *Id.* ¶¶ 38–54. In Count VI, Plaintiff Ashmore seeks relief under the Maine "Whistleblowers' Protection Act." 26 M.R.S.A. §§ 831–840. Motion to Amend Complaint (Docket No. 11), Reply Memorandum in Support of Plaintiffs' Motion for Leave to Amend Complaint (Docket No. 15) at 3–4.

Now pending before the Court is Defendant Cargill Inc.'s Motion to Dismiss Count I, for lack of standing, and Counts II, III, IV, and V for failure to state a claim. (Docket No. 4). Defendants seek dismissal of Count I because they contend that Plaintiffs lack standing to bring a private action under section 4 of the antitrust laws.[3] *Id.* Defendants also seek dismissal of Counts II, IV, and V as to Plaintiff Ashmore for failure to state a cause of action under Maine law, which Defendants contend governs this contract. Finally, Defendants seek dismissal of

Count III for failure to state a claim of promissory estoppel.

To resolve Defendants' Motion to Dismiss, the Court must accept as true all factual allegations in the Complaint, construe them in favor of Plaintiffs, and decide whether, as a matter of law, Plaintiffs could not prove any set of facts which would entitle them to relief. *See Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 25 (1st Cir.1987); *Gott v. Simpson,* 745 F.Supp. 765, 768 (D.Me.1990).

### I. *The Factual Allegations*

Plaintiffs were employed as sales representatives by Defendant Cargill's Northeast Division. As sales representatives, Plaintiffs sold petroleum products to both small and large retailers in the northeastern United States. Plaintiff Ashmore worked out of Northeast Division's Maine office. Plaintiffs Boya and Simone were based in Northeast's Connecticut office, and Plaintiff Simeone was based in Massachusetts. All were trained at and received pricing instructions from the Chelsea, Massachusetts administrative offices of Northeast Division.

Plaintiffs allege that in 1991, Defendants adopted a discriminatory pricing system which violated the Robinson–Patman Act. Specifically they claim that:

> Northeast implemented a company-wide program of assigning customers to pricing groups based on the characteristics of customer loyalty and the ability of each customer to ascertain a fair price ("price sensitivity"). Northeast then assigned different allowances (discounts) to each pricing group. The most generous allowances were assigned to customers in the group

---

**1.** The exact relationship and role of the four Defendants is unclear. Cargill Inc. has responded on behalf of itself and "its unincorporated divisions." Motion to Dismiss (Docket No. 4) ¶ 1. It appears that these unincorporated divisions include Northeast Petroleum Division of Cargill, Inc. It is not clear whether Northeast Petroleum Division of Maine, Inc. and Northeast Petroleum Division of Cape Cod exist at all, are unincorporated divisions of Cargill, or are Massachusetts corporations as alleged in the Complaint. Docket No. 1 ¶¶ 7–8. For purposes of this motion to dismiss, the identity and relationship of the Defendants are not critical.

**2.** Plaintiff Ashmore refused to implement this pricing policy at any time; Plaintiffs Boya, Si-

mone, and Simeone refused at first but ultimately were compelled to implement the pricing policy.

**3.** The issue of whether Plaintiffs have antitrust standing is not an issue of standing in the constitutional sense. Defendants do not argue that Plaintiffs do not allege a case or controversy sufficient to satisfy the requirements of Article III of the Constitution. Rather, their standing argument merely alleges that Plaintiffs are not proper parties to bring this antitrust action. *See Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1977).

considered to be the most able to ascertain a fair price, and the least loyal to Defendants; and the least generous allowance was granted to customers in the group considered to be the least price sensitive and the most loyal. Northeast determined the daily sale price of each product offered to a particular customer by subtracting from the rack price for the product the allowance assigned to the customer's pricing group.... The scheme conferred favored status on large retailers and disfavored status on small retailers....

Plaintiffs' Objection to Defendants Motion to Dismiss and Incorporated Memorandum of Law (Docket No. 7) at 2. Plaintiffs further allege that Northeast's sales representatives were required to take an active role in implementing this policy and "based on their familiarity with their customers, they were required to assign each customer" to one of the pricing groups. *Id.* at 3. Plaintiff Ashmore refused to implement the pricing system. Complaint (Docket No. 1) ¶ 26. Plaintiffs Boya, Simeone, and Simone objected to the new pricing system but were allegedly "forced to implement the price grouping policy under threats of dire consequences." *Id.* ¶ 27. Defendants terminated Plaintiffs' employment at Northeast on May 29, 1992. Plaintiffs allege that this discharge was in retaliation for "their refusal to engage in criminal activity, and resistance to the unlaw-

ful" discriminatory pricing system and "to make an example of them" to other employees who resisted the allegedly illegal practice. *Id.* ¶¶ 34–35.

Plaintiffs further allege that "at all relevant times Defendants Cargill and Northeast Petroleum promised its employees, in writing, that 'no employee will be asked or expected to compromise' Cargill's purported standard that 'business transactions will be the result of legal, open, and honest competition.'" *Id.* ¶ 39. Plaintiffs allege that they relied on this promise to their detriment. *Id.* ¶ 10. Based on this written promise and reliance, they allege that Defendants are liable under a theory of breach of contract or promissory estoppel.

## II. *Standing Under Section 4 of the Clayton Act*

Defendants' principal argument for dismissal of Count I is that Plaintiffs lack standing to sue under section 4 of the Clayton Act to recover for damages due to the alleged violation of the Robinson–Patman Act.[4] Defendants argue that the Robinson–Patman Act was intended to protect only competitors and purchasers and that because Plaintiffs do not allege that they were either competitors or purchasers, they lack standing.[5] Defendants further argue that section 4 provides a remedy only to those who suffer injury which flows from the "anticompetitive effects" of an

---

**4.** Section 4 of the Clayton Act provides in relevant part:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C.S. § 15(a).

**5.** For purposes of this challenge to standing, the Court will assume, without deciding, that Plaintiffs could prove that the alleged discriminatory pricing system violates the Robinson–Patman Act which prohibits discrimination in prices under certain circumstances. In relevant part, the Act provides that:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either

or any of the purchasers involved in such discrimination are in commerce, ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

15 U.S.C.S. § 13(a). Also relevant to the arguments before the Court is 15 U.S.C.S. § 13a, which provides criminal penalties for participation in discriminatory sales.

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to be a party to, or assist in, any transaction of sale, or contract to sell, which discriminates to his knowledge against competitors of the purchaser....

Any person violating any of the provisions of this section shall upon conviction thereof, be fined not more than $5,000 or imprisoned not more than one year, or both.

antitrust violation. Therefore, they contend that the injury which Plaintiffs suffered due to the allegedly retaliatory discharges was not the type of "antitrust injury" with which Congress was concerned when it enacted section 4 of the Clayton Act. In response to these arguments Plaintiffs contend that because they were "essential participants" in the anticompetitive scheme, and their discharge was a necessary step to achieve the antitrust violation, they have standing under section 4.

The issue of whether an employee has standing to sue under section 4 on a claim of retaliatory discharge for resisting the implementation of a policy which violates the federal antitrust laws has not been addressed by the Supreme Court and is a matter of first impression in this Circuit. As the parties point out, there is a split among federal courts on this issue.[6] The Court of Appeals for the Ninth Circuit has held that an employee subjected to retaliatory discharge for refusing to cooperate with a price-fixing conspiracy in violation of the Sherman Act has standing under section 4. *Ostrofe v. H.S. Crocker Co.,* 740 F.2d 739 (9th Cir.1984), *cert. dismissed at request of parties,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985).[7] The United States District Court for the Southern District of New York followed the Ninth Circuit's *Ostrofe II* holding in *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F.Supp. 1423 (S.D.N.Y.1986). On the other hand, courts in the Seventh, Third, and Tenth Circuits have held that employees who allege retaliatory discharge for refusal to cooperate with policies that violate the antitrust laws do not have standing under Section 4. *Bichan v. Chemetron Corp.,* 681 F.2d 514 (7th Cir.1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983); *Winther v. DEC International, Inc.,* 625 F.Supp. 100 (D.Colo.1985); *McNulty v. Borden, Inc.,* 542 F.Supp. 655 (E.D.Pa.1982).[8] The Sixth Circuit has also denied standing to a sales representative who alleged his territory was reduced and later eliminated due to his refusal to cooperate in an antitrust violation. *Fallis v. Pendleton Woolen Mills, Inc.,* 866 F.2d 209, 211 (6th Cir.1989).[9]

These different results have stemmed from varied interpretations of the Supreme Court's holdings in three recent antitrust standing cases: *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); and *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In the most recent of this trilogy, the Supreme Court set out a comprehensive antitrust standing analysis, identifying factors which must be considered in determining whether a plaintiff may sue under section 4 of the Clayton Act. *Associated General,* 459 U.S. at 535–45, 103 S.Ct. at 907–12. It is in this framework that this Court must evaluate Plaintiffs' claim to antitrust standing.

---

**6.** Northeast makes much of the fact that no court has granted standing under section 4 based on a violation of the Robinson–Patman Act. However, the analysis required by the Supreme Court to determine whether a plaintiff has standing under section 4 of the Clayton Act does not depend upon whether the underlying violation is of the Sherman Act or of the Robinson–Patman Act. (*see* discussion of *Associated General, infra* ). Therefore, the Court is not constrained to consider only those cases based on Robinson–Patman violations.

**7.** In this case, the Court of Appeals for the Ninth Circuit adhered to its prior decision in *Ostrofe v. H.S. Crocker Co.,* 670 F.2d 1378 (9th Cir.1982), *vacated,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983). The earlier decision will be referred to as *"Ostrofe I"* and the decision on remand as *"Ostrofe II"*.

**8.** There is contrary authority at the district court level in the Third Circuit. *See Shaw v. Russell Trucking Line, Inc.,* 542 F.Supp. 776 (W.D.Pa. 1982). However, the decision in *Gregory Marketing Corp. v. Wakefern Food Corp.,* 787 F.2d 92 (3d Cir.1986), denying standing to a broker who alleged retaliatory discharge for refusal to violate the Robinson–Patman Act, suggests, without deciding, that the Third Circuit would deny standing to an employee claiming retaliatory discharge for refusal to violate the antitrust laws.

**9.** However, *Fallis* requires a case-by-case standing analysis, and does not appear to stand for the proposition that no employee may recover on a theory of retaliatory discharge. *See Helder v. Hitachi Power Tools, U.S.A. Ltd.,* 1992–2 Trade Cas. P69,930, 1992 WL 237312 (W.D.Mich.1992) (denying a motion for judgment on the pleadings in a retaliatory discharge case).

Therefore, the Court will review the *Associated General* approach before analyzing the matter *sub judice.*

### A. *Antitrust Standing under Associated General*

Before *Associated General,* the various circuit courts had adopted different tests incorporating traditional common-law principles to limit the scope of the treble damages provision of the Clayton Act which provides standing to *any person* injured by reason of violations of the antitrust laws. 15 U.S.C.S. § 15(a). The three principal tests that emerged focused on the "directness" of a plaintiff's injury to the alleged violation; whether a plaintiff was in the "target area" of the anticompetitive activity; and whether a plaintiff was arguably within the zone of interests protected by the antitrust laws. *Associated General,* 459 U.S. at 536 n. 33, 103 S.Ct. at 907 n. 33 (citations omitted). In considering these tests, the Supreme Court concluded that Congress intended the availability of the remedy to be construed in light of traditional notions of common law.[10] *Id.* at 530–35, 103 S.Ct. at 904–07. However, the Court declined to adopt a single standard, observing that:

> There is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of "proximate cause," and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages. It is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing. In both situations the infinite variety of claims that may arise *make it virtually impossible to announce a blackletter rule* that will dictate the result in every case. Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances.

*Id.* at 535–36, 103 S.Ct. at 907 (footnotes omitted and emphasis added).[11] The Court then went on to identify the factors which are relevant to the issue of antitrust standing and apply them to the plaintiff's claim for recovery. Both the identification of the factors and their application are instructive in this Court's determination of whether Plaintiffs have standing in the present matter.

In *Associated General,* two carpenters' unions ("the Union") alleged that the defendant, a multiemployer association of general contractors, coerced its members, other general contractors, and certain third parties (landowners and customers in the construction market) to divert business to nonunion firms. The Union alleged that the express purpose of the multiemployer association's actions was to injure the Union. However, the first class of victims of the alleged conspiracy was the coerced contractors, the second the unionized firms, and then presumably the Union might have suffered injury through

---

**10.** When Congress originally enacted the Sherman Act, there was no provision for treble recovery. The amendment providing for treble damages was enacted in 1914 to encourage private enforcement of the antitrust law. By 1914, when section 4 of the Clayton Act was enacted, courts were already applying traditional notions of proximate cause to circumscribe liability under the Act. *See Associated General,* 459 U.S. at 534, 103 S.Ct. at 906 (*citing Loeb v. Eastman Kodak Co.,* 183 F. 704 (3d Cir.1910) (in which a stockholder of a corporation injured by an antitrust violation was not entitled to recover treble damages because the injury was "indirect, remote, and consequential")). Therefore, when Congress enacted section 4 of the Clayton Act in 1914, it "presumably also [adopted] the judicial gloss." *Id.*

**11.** Defendants argue that the "target area" test for antitrust standing, which the First Circuit followed before *Associated General,* bars Plaintiffs' claim. *See Engine Specialties, Inc. v. Bombardier, Ltd.,* 605 F.2d 1 (1st Cir.1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980). The "target area" test permits standing only for those in the market towards which an anticompetitive activity is directed. In *Associated General,* however, the Supreme Court rejected the "target area" test in favor of the standing analysis set out in the text below. *Associated General,* 459 U.S. at 536, n. 33, 103 S.Ct. at 907, n. 33. *Associated General* requires a broader inquiry and a balancing of concerns which is not satisfied by the "target area" test. *See Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1086 (6th Cir.1983) ("implement[ing] the Supreme Court's directive to consider the § 4 inquiry on a case by case basis by applying the criteria mandated by *Associated General* ").

loss of dues or collective bargaining agreements.

■ The Court considered each of the following factors in assessing the Union's standing to sue for treble damages under section 4:

(1) the causal connection between the Union's injury and Defendant's violation of the antitrust law;

(2) the nature of the Union's alleged injury and whether it was of the type that the antitrust laws were intended to forestall;

(3) the directness of the injury particularly as it related to the tenuous and speculative nature of the harm to the Union;

(4) the danger of duplicative recoveries or complex apportionment of damages; and

(5) the existence of more immediate classes of potential plaintiffs who could be expected to vindicate the violation of the antitrust laws.

*Associated General*, 459 U.S. at 536–45, 103 S.Ct. at 907–12. Of the five relevant factors, only the causal connection between the Union's alleged injuries and the violation of the antitrust laws weighed in favor of standing. The Supreme Court, in denying the Union standing to sue under section 4, summarized the analytical path pursued at some length in the opinion, reaching the following conclusion:

> [T]he Union's allegations of consequential harm resulting from a violation of the antitrust laws, although buttressed by an allegation of intent to harm the Union, are insufficient as a matter of law. Other relevant factors—the nature of the Union's injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the Union's alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of

the alleged conspiracy—weigh heavily against judicial enforcement of the Union's antitrust claim.

*Id.* at 545, 103 S.Ct. at 912.

Though *Associated General* outlined a comprehensive approach to the question of antitrust standing, it has engendered much confusion. The decision gives little guidance as to how to weigh the various factors and, more particularly, whether the absence of any one factor is fatal to standing in every instance.[12] It is this Court's reading of *Associated General* that a proper standing analysis should include a review of all relevant factors outlined in that case. *Accord, Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1086 (6th Cir.1983). While any of these factors may be controlling, each should be considered on a case-by-case basis in an effort to guard against "engraft[ing] artificial limitations on the § 4 remedy." *McCready,* 457 U.S. at 472, 102 S.Ct. at 2544. This conclusion is based on the Supreme Court's refusal in *Associated General* to adopt a single test, its emphasis on the impossibility of adopting a black letter rule of antitrust standing, and its application of each factor to the facts alleged by the Union.

### B. *Application of Associated General to Plaintiffs' Case*

At the outset, it is clear that the allegations made by Plaintiffs, if proven, satisfy four of the five factors identified in Associated General. As to the first factor, Plaintiffs' allegations satisfy the causal connection required by section 4; that is, Plaintiffs allege that their employment was terminated in order for Northeast to accomplish a violation of the antitrust law. If not for the implementation of a discriminatory pricing system, Plaintiffs contend that they would not have had to resist the allegedly illegal scheme and, consequently, they would not have been discharged.

---

12. For a general discussion of the various approaches to standing analysis in the wake of *Associated General, see* Robert M. Taylor, *Antitrust Developments: Antitrust Standing: Its Growing—or More Accurately Shrinking—Dimensions,* 55 Antitrust L.J. 515 (1986). For a discussion of the application of *Associated General* to

the case of discharged employees, *see, e.g.,* Gary M. Shaw, *Retaliatorily Discharged Employees' Standing to Sue Under the Antitrust Laws,* 67 Or.L.Rev. 331 (1988); Matthew H. Lynch, Note, *Antitrust Standing After Associated General Contractors: The Issue of Employee Retaliatory Discharge,* 63 B.U.L.Rev. 983 (1983).

The harm to Plaintiffs in this case was direct also and, in this regard, does not implicate the concerns underlying the third factor which militated against standing in *Associated General*. In *Associated General* the Supreme Court noted that several "vague links" separated the defendant's alleged antitrust violation from the Union's harm. *Associated General*, 459 U.S. at 542, 103 S.Ct. at 910. Because of the attenuated link between the antitrust violation and the injury to the Union, the Union's alleged injuries were "highly speculative." *Id.* In that case, it was unclear what effect the alleged conspiracy had on the unionized firms. *Id.* It was even more difficult to determine whether the conspiracy, as opposed to other intervening causes, had caused any injury to the Union itself in the form of decreased membership revenues or termination of particular collective bargaining agreements. *Id.* Here, there is nothing that is either indirect or speculative about Plaintiffs' claims. They allege that their injuries were the direct and intended result of Defendants intentional act in furtherance of an antitrust violation. The damages claimed are in the form of lost wages and benefits. These damages are easily quantifiable and are not speculative.

The fourth factor considered by the Supreme Court in *Associated General* was the danger of duplicative treble-damage awards, or problems of complex apportionment of damages. In *Associated General*, to the extent that the Union had suffered injury, it was derivative of the injury suffered by the coerced contractors and unionized firms. Therefore, there was a risk that the defendant could be exposed to multiple awards of treble damages or that the Court would have to engage in complex apportionment. Determining to what extent losses were absorbed at each level of the chain of distribution—the coerced contractors, the unionized firms, their employees, and finally the Union—was a task that was rejected by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Failure to make such a determination would lead inevitably to liability in treble damages to multiple parties for the same injury.[13] In contrast, Plaintiffs in the present case allege injuries in the form of lost compensation and benefits. These damages are wholly distinct from damages that could be claimed by other plaintiffs injured by the alleged antitrust violation. The injury is not derivative, but personal to Plaintiffs. Therefore, there is no danger of duplicative recovery.

As to the fifth factor, there is no other class more directly affected than Plaintiffs in the present case that is more likely to redress society's interest in enforcement of the antitrust laws. In *Associated General*, the Supreme Court noted that both the coerced contractors and the union contractors were more directly affected then the Union and, therefore, "[d]enying the Union a remedy [was] not likely to leave a significant antitrust violation undetected or unremedied." *Associated General*, 459 U.S. at 542, 103 S.Ct. at 911. As a general matter, however, a major challenge in antitrust law enforcement is that a violation "is usually a concealed crime and there is rarely an identifiable victim who is aware of the violation." *Statement of Former Assistant Attorney General Donald Baker Before Tenth New England Antitrust Conference*, 790 Antitrust & Trade Reg.Rep. (BNA) D–1 (1976), *cited in*, Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809, 847. This challenge to antitrust law enforcement is strongly implicated in the present case.

Here, although purchasers disadvantaged by the alleged discriminatory pricing system are also direct victims of the alleged antitrust violation, the very nature of the pricing system makes it unlikely that the victims will become aware of the price differentials unless sales representatives reveal the violation and risk discharge. The alleged pricing system discriminates against purchasers on the

---

**13.** The Court noted that this task was further complicated by the variety of forms in which the cost of the anticompetitive violation might be absorbed in *Associated General*. These costs may have taken the form of reduced profits, reduced wages, reduced workforce, reduced hours, and lost union dues at various levels in the chain. *Associated General*, 459 U.S. at 544, 103 S.Ct. at 912.

basis of customer loyalty and lack of accurate pricing information. It relies for concealment of this discriminatory activity upon the loyalty, expertise, and perceived self-interest of its sales employees. Those victims directly damaged by the anticompetitive effect of the pricing system are the least informed purchasers in the market and are unlikely to discover the violation in a timely manner.[14]

Plaintiffs, as sales representatives, were allegedly charged with implementing the discriminatory pricing system. They are alleged to have been made responsible for grouping clients according to the clients' loyalty and lack of accurate price information. In this position Plaintiffs were more likely to recognize the antitrust violation at an earlier stage and to vindicate the public interest in prohibiting anticompetitive activities before any purchasers and consumers and before competition suffered extensive injury. Although the purpose of the discriminatory pricing system was not to injure Plaintiffs, discharging uncooperative sales representatives was a prerequisite to full implementation of the discriminatory pricing system from the standpoint of Defendants. Furthermore, Plaintiffs allege that their discharge was used to demonstrate to other sales representatives the consequences of challenging the pricing system.

These sales representatives were direct and necessary victims of the antitrust violations because they faced the options of exposing themselves to criminal liability or risking retaliatory discharge. There is no other class of plaintiffs which has any claim under which it can redress the harm Plaintiffs' allegedly suffered by reason of their refusal to violate the antitrust laws. Nor could the purchasers affected by the allegedly discriminatory pricing system challenge the system at as early a stage as the employees charged with implementing the pricing system. Assuming, without deciding, that the allegations made by Plaintiffs are true, barring standing to Plaintiffs under these circumstances is "likely to leave a significant antitrust violation undetected or unremedied."[15] *Associated General*, 459 U.S. at 542, 103 S.Ct. at 911.

These four factors favor antitrust standing for Plaintiffs in this case. Their injuries are the direct result of actions taken in furtherance of an alleged attempt to implement a discriminatory pricing system in violation of the Robinson–Patman Act. There is no other class of plaintiffs which is *more* directly effected by these actions, and Plaintiffs' injuries are wholly distinct from the injuries suffered by any *other* class of victims; therefore, there is no danger of duplicative recoveries or complex apportionment. Finally, there is nothing speculative about the amount of damages suffered by these Plaintiffs.

14. The delay that can be expected before such disadvantaged purchasers become aware of the anticompetitive effects of an antitrust violation is not without costs. Although treble damages may provide a remedy for injured individuals, once competition has been reduced, damages alone cannot restore it. Furthermore, under the rule of *Illinois Brick*, consumers of petroleum products are unlikely to have any remedy for their injury in this case. Any damage to consumers would be derivative of the injury to the purchasers of petroleum goods for resale who are allegedly the first line of victims of this price discrimination scheme.

15. This Court notes that, in light of the difficulty in detecting antitrust violations, providing standing to employees who are coerced to violate the antitrust laws is more likely to provide efficient enforcement than denying standing. In reaching this conclusion, the Court has rejected the Seventh Circuit's economic analysis as unconvincing. *See Bichan v. Chemetron Corp.*, 681 F.2d 514, 520 (7th Cir.1982). The Court of Appeals for the Seventh Circuit's approach to "efficient enforcement" balances the conflicting interest of enforcement of the antitrust laws with "the avoidance of excessive treble damages litigation" and concludes that only consumers and competitors should have standing because "[i]t is this select class of plaintiffs that can impose the deterrent sting of treble damages at the smallest cost of enforcement." *Id.* This conclusion rests on the unrealistic assumption that consumers and competitors will discover antitrust violations. Moreover, it fails to consider the efficiency of the deterrent effect that employee standing will have in preventing antitrust violations. Finally, no consideration is given to the fact that an employee who complies with coercion to avoid discharge will himself be guilty of criminally violating the antitrust laws or that such cooperation both increases the number of antitrust violations and the cost to consumers, competitors, and the legal system when antitrust schemes are eventually discovered.

## C. *Antitrust Injury*

■ The principal standing issues raised by the Plaintiffs' claim relate to the second factor: whether the alleged injury is "antitrust injury"; that is, the type of injury that the antitrust laws were intended to forestall. In the context of the retaliatory discharge claim raised in this case, there are two relevant inquiries. First, whether the harm caused by retaliatory discharge is "antitrust injury." And second, whether failure to demonstrate "antitrust injury" in the narrowest sense is fatal to standing in every case. The Court will address these questions in turn.

The concept of "antitrust injury" was first articulated in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In that case, several small bowling centers sued Brunswick Corp. to challenge its acquisition of a number of failing bowling centers. The challenge was mounted under section 7 of the Clayton Act which proscribes mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C.A. § 18. The smaller bowling centers also sued to recover treble damages under section 4 for the profits lost due to the continued competition from the acquired bowling centers which they contended would have otherwise gone out of business. They did not prove that Brunswick had engaged in any of the predatory actions which section 7 was designed to prevent. Although the plaintiffs in *Brunswick* had standing to challenge the improper mergers, the Supreme Court unanimously held that they were not entitled to relief under section 4 of the Clayton Act because they had not proven " 'antitrust injury' of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489, 97 S.Ct. at 697.

> [T]he antitrust laws are not merely indifferent to the injury claimed here. At base, respondents complain that by acquiring the failing centers petitioner preserved competition, thereby depriving respondents of the benefits of increased concentration. *The damages respondents obtained are designed to provide them with the profits they would have realized had competition been reduced.* The antitrust laws, however, were enacted for "the protection of *competition, not competitors.*" It is inimical to the purposes of these laws to award damages for the type of injury claimed here.
>
> ... [I]t is far from clear that the loss of windfall profits that would have accrued had the acquired centers failed even constitutes "injury" within the meaning of § 4. And it is quite clear that if respondents were injured it was not "by reason of anything forbidden in the antitrust laws": while respondents' loss occurred "by reason of" the unlawful acquisitions, it did not occur "by reason of" that which made the acquisitions unlawful.

*Id.* at 488, 97 S.Ct. at 697 (citations omitted and emphasis added). The Supreme Court found that the *Brunswick* plaintiffs were not entitled to a remedy under section 4 because their losses were due to an *increase in competition* and were not the result of predatory actions.

Five years later, in *McCready*, the Supreme Court addressed the issue of whether injury that occurred as a necessary step to accomplishing an antitrust violation was "antitrust injury." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In *McCready*, the plaintiff was a subscriber to the Blue Shield medical plan. She alleged that Blue Shield and an association of psychiatrists had engaged in an anticompetitive conspiracy to disadvantage psychologists. This conspiracy was accomplished by refusing reimbursement to Blue Shield subscribers for treatment rendered by psychologists while reimbursing subscribers for the same treatment received from psychiatrists or from psychologists acting under the supervision of a physician. McCready received treatment from a psychologist and Blue Shield refused to reimburse her for the treatment. The Court concluded that:

> Although McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy mar-

ket. In light of the conspiracy here alleged we think that McCready's injury "flows from that which makes defendants' acts unlawful" within the meaning of Brunswick, and falls squarely within the area of congressional concern.

*Id.* at 483–84, 102 S.Ct. at 2551.[16] Blue Shields' refusal to reimburse McCready for therapy received from a psychologist was a means whereby it coerced her to either become an unwilling participant in its illegal campaign to boycott the services of psychologists or pay the costs for treatment from her own pocket in order to see the therapist of her choice. The injury that she suffered was due to her refusal to be manipulated and was not due to anticompetitive effect or a change of price in the market.

Here, Plaintiffs allegedly confronted a similar Hobson's choice, though the consequences on either side were much more grave than in *McCready*. They could capitulate to their employer's pressure and participate in a violation of the antitrust laws or resist the discriminatory pricing system and face discipline or discharge. Here, however, Plaintiffs' cooperation may also have exposed them to criminal liability. In *Ostrofe I*, the Court of Appeals for the Ninth Circuit concluded that injury suffered by an employee under these circumstances is within the "core of Congressional concern" which motivated the antitrust laws. *Ostrofe I*, 670 F.2d at 1387.

The central theme of *Brunswick* is that to be actionable under Section 4, plaintiff's injury should fall within the core of Congressional concern underlying the substantive provision of the antitrust laws allegedly violated. In outlawing price fixing and customer allocation under the Sherman Act, Congress was concerned with compet-

itive conditions in the product market; hence competitors and perhaps consumers injured by the elimination of competition between the conspiring business concerns have standing to sue.

But Congress was also concerned with the conduct of individuals acting on behalf of conspiring economic entities. Congress imposed criminal liability upon individuals who violate the Sherman Act even though they act in a representative capacity and in discharge of the duties of the employment. It cannot be said that Ostrofe's asserted loss was "of no concern to the antitrust laws." Ostrofe was injured because of his efforts to comply with the mandate of the Sherman Act; he suffered an "antitrust injury ... of the type the antitrust laws were intended to prevent."

Moreover, the loss did not result from increased competition, as did the asserted loss in *Brunswick*, but from a conspirator's efforts to realize an anticompetitive purpose.

*Ostrofe I*, 670 F.2d at 1387–88 (footnotes omitted). On remand, application of *Associated General* and *McCready* to the question of whether standing for an employee subjected to retaliatory discharge for refusing to participate in an antitrust violation did not undercut this conclusion. *See Ostrofe II*, 740 F.2d at 745–46 (affirming the reasoning in *Ostrofe I* and concluding that Ostrofe's injury "was such an integral part of the scheme to eliminate competition in that market as to constitute 'antitrust injury,'" *id.* at 746); *see also Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423 (S.D.N.Y.1986) (following *Ostrofe II*). On similar reasoning, the Court of Appeals for the Sixth Circuit has found that antitrust standing does not require an allegation that one is a competitor

---

**16.** Defendants argue that *McCready* has no application in the present case because McCready was a consumer in the market for psychotherapy treatment. Reply Brief in Support of Motion to Dismiss (Docket No. 12) at 1. However, they ignore the central thrust of *McCready* which rejects artificial constraints on section 4, refusing to limit its protection "to consumers, or to purchasers, or to competitors, or to sellers." *Id.* at 472, 102 S.Ct. at 2544.

The central problem raised by McCready's claim was that *her injury was not the result of any*

*anticompetitive effect* of the conspiracy. As Justice Rehnquist noted in his dissenting opinion, McCready "alleges that Blue Shield's policy violates the antitrust laws only by virtue of its anticompetitive effect on *psychologists*. She does not allege that Blue Shield's policy is illegal in any way because of its effect on *subscribers*." *Id.* at 491, 102 S.Ct. at 2554–55. The issue which split the Court was whether injury which was caused by the attempted use of McCready as an *instrument* to carry out an antitrust violation was "antitrust injury."

or consumer in the relevant market if a plaintiff was "manipulated or utilized by [defendant] as a fulcrum, conduit or market force to injure competitors." *Fallis*, 866 F.2d at 211 (quoting *Southaven*, 715 F.2d at 1086).[17]

Other courts have read the antitrust laws more narrowly, holding that Congress intended to provide a remedy for injuries suffered only by market participants when it enacted section 4. *Bichan v. Chemetron Corp.*, 681 F.2d 514 (7th Cir.1982); *Winther v. DEC International, Inc.*, 625 F.Supp. 100 (D.Colo.1985); *McNulty v. Borden, Inc.*, 542 F.Supp. 655 (E.D.Pa.1982). These courts reason that because a discharged employee's injury is not due to diminished competition in any market in which the employee is a consumer or competitor it is not "antitrust injury." [18] In *Bichan* the Court of Appeals for the Seventh Circuit concluded that Congress was concerned only with damages due to anticompetitive effects of antitrust violations, "not employee coercion or discharge." *Bichan*, 681 F.2d at 519, *accord Winther*, 625 F.Supp. at 102 (Congress did not "intend[ ] to protect employees from wrongful coercion or discharge"); *cf., McNulty*, 542 F.Supp. at

661 (acknowledging the weighty policy considerations raised in *Ostrofe* but finding that under Third Circuit "target test" then in use, only competitors and consumers had standing under the Robinson–Patman Act).[19]

Upon review of all these cases and the history of section 4 and the Robinson–Patman Act, this Court is persuaded that the more flexible approach of *Ostrofe II* is more consistent with the purposes of the antitrust laws than the extremely narrow limitations of *Bichan*. As was noted in *McCready*, Congress's ·purpose in enacting the treble damage remedy in section 4 was "to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions and would provide ample compensation to the victims of antitrust violations." *McCready*, 457 U.S. at 472, 102 S.Ct. at 2544. The statute provides a remedy for "any person" injured and "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers." *Id.* (*quoting Mandeville Island Farms Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948)). While it has been clear from the beginning

---

**17.** Nevertheless the Court of Appeals of the Sixth Circuit denied standing in *Fallis*, holding that the plaintiff sales representative's injury was not direct. *Fallis*, 866 F.2d at 212. In so doing, they revert to the "target test" and conclude that the injury to the sales representative is indirect because it is a "byproduct" of the antitrust violation. *Id.* at 211. This reasoning improperly introduces the element of intent into the directness inquiry. *See McCready*, 457 U.S. at 479, 102 S.Ct. at 2548 (concluding that the fact that the goal of the conspiracy was to injure psychologists did not make the subscriber's injury "remote"). There is no doubt that the injury alleged in this case is the *direct* and *immediate* result of steps taken in furtherance of the antitrust violation. There are no intermediate victims; no danger of duplicative damages; and nothing speculative about the injury to a discharged employee. *The fact that the injury is not the primary goal of the violation does not render the injury indirect.*

**18.** One concern of these courts is that the damages claimed by a victim of wrongful discharge are "unrelated" to the anticompetitive effect of a violation. These costs, though they may be unrelated to the anticompetitive effects in a mathematical sense, are incurred by the intentional acts of an employer to carry out an anticompetitive scheme. The cost to a discharged employee are much like those injuries incurred in

*McCready*. The amount of the reimbursement refused to McCready had no relationship to the anticompetitive effects on the market for psychotherapy. Rather, this amount related to the type and cost of treatment that McCready received. Nevertheless, there was no surprise or injustice to Blue Shield, who knowingly refused McCready a fixed amount in furtherance of its anticompetitive conspiracy. The injuries which are deliberately inflicted in an attempt to coerce third parties to participate in an anticompetitive scheme should be part of the calculus that encourage would-be antitrust violators to shrink from pursuing illegal schemes.

**19.** The reasoning in all these cases is scant. They rely on *Brunswick* and interpret it as limiting section 4 claims to injury caused by the anticompetitive effects of antitrust violations. The cases ignore the fact that *Brunswick* dealt with injuries caused by *increased competition*. They also overlook the essential *Brunswick* holding that the purpose of the antitrust laws is to protect "competition, not competitors." *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697. In the retaliatory discharge context, refusing standing to employees for no other reason than that they are not competitors seems to read this statement backwards.

that courts must formulate some limits on liability for antitrust violations, these limitations have been adopted "in accordance with [section 4's] plain language and its broad remedial and deterrent objectives." *Id.* at 473, 102 S.Ct. at 2545. *Associated General* does not hold otherwise. *Associated General* rejected any black letter rule but considered each factor in light of the overall purposes of the antitrust laws. If failure to allege that one is a competitor, consumer, or purchaser in the relevant market is dispositive in every case, as Defendants contend, than the greater part of the *Associated General* opinion is useless verbiage.[20]

The Supreme Court was absolutely unambiguous in *Associated General* in rejecting any black letter rule of antitrust standing, and this Court will not adopt one now. Therefore, we reject the reasoning of the Seventh, Third, and Tenth Circuits as inconsistent with the analysis required by *Associated General* and *McCready* which does not permit a single factor to be dispositive unless consideration of the overall purpose of the antitrust laws so dictates.[21]

There can be no doubt that Congress was concerned with the conduct of employees and agents who assisted in carrying out antitrust violations in the discharge of their duties. The Robinson–Patman Act imposes personal criminal liability on any person engaged in commerce who knowingly assists in a discriminatory transaction of sale. 15 U.S.C.A. § 13a. Providing a remedy to those employees who suffer injury for refusing to violate this law will serve the deterrent purpose of both the criminal sanctions in the Robinson–Patman Act and the treble-damages remedy of the Clayton Act.

Finally, standing is appropriate in light of the remedial purposes of section 4. Here, unlike *Associated General* in which the Supreme Court emphasized that the Union was protected by federal labor law, it is not at all clear that employees subjected to wrongful discharge will have any remedy at law. *See, e.g., Fallis* 866 F.2d at 211 (holding plaintiff lacked standing under section 4 and had no cause of action under Ohio law because Ohio law did not recognize an action for wrongful discharge and treated employment contracts "until retirement" as at-will employment contracts). As was noted in *Ostrofe I* many states do not recognize a cause of action for at-will employees who are subjected to retaliatory discharge.[22] *Ostrofe I*, 670 F.2d at 1384 n. 12. Because the Court finds that the type of injury alleged herein was within the core area of congressional concern, the Court concludes that Plaintiffs have alleged "antitrust injury" within the meaning of *Associated General*, *McCready*, and *Brunswick*.

---

**20.** Indeed, even the discussion about whether the Union had alleged "antitrust injury" within the meaning of *Brunswick* was unnecessary according to Defendants. Under Defendants' approach, the first sentence of this discussion was dispositive insofar as it pointed out that the Union was neither a consumer nor a competitor in the relevant market. Nevertheless, the *Associated General* court went on to observe that labor enjoys a broad exemption from antitrust laws, is protected by another body of federal law, and is generally not served by increased competition. *Associated General*, 459 U.S. at 539–40, 103 S.Ct. at 909. All these considerations apparently went into the determination that the Union had not alleged "antitrust injury." *Id.*

**21.** *Brunswick* is not to the contrary; there, not only did the Supreme Court hold that the plaintiffs in that case had not alleged antitrust injury, but they found that the "injury" which had been alleged was "inimical" to the purposes of the antitrust laws. The *Bichan* conclusion that Congress was not concerned with employee coercion or discharge, even if correct, does not automati-

cally lead to the conclusion that injury related to such coercion is "inimical" to the purposes of the antitrust laws.

**22.** The trend has been to recognize a cause of action for wrongful discharge; however, as of 1992, nine of the forty-seven states that had ruled on this issue did not provide a remedy for employees discharged for refusing to violate the law. *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 106 n. 4 (Colo.1992) (adopting a cause of action based on wrongful discharge in violation of public policy and reviewing the holdings of other state courts). *See generally*, 82 Am. Jur.2d § 47. Maine is one of the few states that have not yet ruled on this issue. Maine law provides a limited statutory cause of action which protects employees who refuse to implement an employer's unlawful practice only when such practice would create a danger of serious injury or death. 26 M.R.S.A. § 833. However, the Maine courts have not yet ruled on whether Maine common law will permit a cause of action to be established for wrongful discharge in violation of public policy.

Even if this Court reads the concept of "antitrust injury" too broadly, and if this concept is limited to injuries suffered by participants (consumers, sellers, purchasers) in the relevant market, this Court concurs with the courts that have reasoned that failure to allege participation in the relevant market, although it weighs heavily against antitrust standing, is not fatal to a claim of standing under the antitrust laws. *See, e.g., South Dakota v. Kansas City Southern Industries, Inc.,* 880 F.2d 40, 46 n. 16 (8th Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990); *Province v. Cleveland Press Publishing Co.,* 787 F.2d 1047, 1052 (6th Cir.1986); *Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 293 (2d Cir.1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); *Sullivan v. Tagliabue,* 828 F.Supp. 114, 117 (D.Mass.1993). As the Court of Appeals for the Ninth Circuit observed in *Ostrofe II,* granting standing to an employee who is discharged for his attempt to resist an anticompetitive scheme will accomplish the principal goal of antitrust laws, which are designed to "protect *competition* not competitors" without compromising the concerns raised by the other factors identified in *Associated General. Ostrofe II,* 740 F.2d at 747. Permitting Plaintiffs' standing here will advance enforcement and deterrence, and protect competition in the affected market. All the other factors identified in *Associated General* weigh heavily in favor of standing for the Plaintiffs in this case. Therefore, this Court holds that Plaintiffs have standing on the allegations of the Complaint under the approach set out in *Associated General* and that such conclusion is consistent with the purposes of the Robinson–Patman Act.

### III. *Choice of Law*

Defendants argue that Maine law applies to Plaintiff Ashmore's claims for breach of contract (Count II), breach of covenant of good faith (Count IV), and wrongful termination (Count V). Defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(6), for the dismissal of these claims, arguing that Maine law does not recognize a cause of action for termination of an employment contract unless the contract expressly provides some limitation on the employer's ability to terminate the employee. Memorandum in Support of Defendants' Motion to Dismiss (Docket No. 5) at 16, *citing Larrabee v. Penobscot Frozen Foods, Inc.,* 486 A.2d 97, 99 (Me.1984). Plaintiffs oppose this motion, contending that the most significant contacts in this contract case are with the Commonwealth of Massachusetts and that Maine choice-of-law rules lead to the conclusion that Massachusetts law governs these claims.

As a threshold matter, it is necessary for the Court to determine what choice-of-law rules to apply to these claims. A federal court which exercises supplemental jurisdiction over state-law claims based on diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In this case, the Complaint invokes federal question jurisdiction under federal substantive antitrust law.[23] 28 U.S.C.A. §§ 1331 and 1337. Supplemental state-law claims in a case where jurisdiction is based on federal question are also decided with reference to the choice-of-law provisions of the state in which the federal court sits. *Bangor Baptist Church v. Maine Department of Educational and Cultural Services,* 576 F.Supp. 1299, 1313 (D.Me. 1983); *Rental Car of New Hampshire Inc. v. Westinghouse Electric Corp.,* 496 F.Supp. 373 (D.Mass.1980). The Court will, therefore, apply Maine's choice of law rules to determine what law applies to Plaintiff Ashmore's supplemental state-law claims.

The State of Maine generally follows the *Restatement (Second) of Conflicts* in determining choice-of-law issues. *Maine Surgical Supply Co. v. Intermedics Orthopedics, Inc.,* 756 F.Supp. 597, 600 (D.Me.1991).

---

**23.** Although Plaintiffs allege jurisdiction based on diversity as well as federal question, the Complaint indicates that at least one Plaintiff (Richard Simeone) and several Defendants are citizens of Massachusetts for diversity purposes. Complaint ¶¶ 5, 7, 8. Jurisdiction under 28 U.S.C.A. § 1332 requires complete diversity between plaintiffs and defendants. Therefore, on its face, the Complaint does not provide a basis for subject matter jurisdiction on diversity grounds.

Counts II and IV both state claims based on contract law. In the absence of an effective choice of law by the parties to a contract, the Court must consider what state "has the most significant relation" with respect to a specific issue in dispute, including the following contacts to the extent that they are relevant to the issue: (1) place of contracting; (2) place of negotiation; (3) place of performance; (4) where the subject matter of the contract is located; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Restatement (Second) of Conflicts* § 188(1), (2). Where the place of negotiating the contract and the place of performance are in the same state, the local law of that state will be applied except in circumstances not here applicable. *Restatement (Second) of Conflicts* § 188(3) (1971).

■ Taking all the relevant factors into account the contacts in this case point to the application of Massachusetts law. The place of contracting as well as the place of negotiation of the contract were in Massachusetts. Affidavit of Frederick W. Ashmore in Support of Motion for Leave to Amend (Docket No. 11, Exhibit A) ¶¶ 2–3.[24] The place of performance is not so obvious. Ashmore worked out of an office in Portland, Maine. Maine taxes were withheld from his paycheck, and workers' compensation payments were made to the state of Maine during his employment at Northeast. Affidavit of Virginia Palladino (Docket No. 12, Exhibit 3) ¶ 4. However, his sales territory included New Hampshire, Vermont, and Massachusetts as well as Maine. Affidavit of Ashmore ¶¶ 8–14. Ashmore's responsibilities included visiting customers in all these states. Affidavits of James Flaherty and William Overton. (Docket No. 2, Exhibit 5) ¶ 5. When Ashmore was terminated, he had eighty-nine accounts: forty-one in Massachusetts, twenty-six in Maine, fourteen in New Hampshire, and five in Vermont. Affidavit of Frederick Ashmore (Docket No. 11, Exhibit A) ¶¶ 6–14. Some of the product he sold was from Maine terminals while other product was from Mas-

sachusetts. It appears that Ashmore generally met with his supervisors in Maine, New Hampshire, or Massachusetts when he was under the supervision of Flaherty; and in New Hampshire or Massachusetts in the last two years before his discharge. Affidavit of James Flaherty (Docket No. 12, Exhibit 4) ¶ 6 and Affidavit of Overton ¶ 4. All formal sales representative meetings took place in Massachusetts, as did training meetings. Affidavit of Ashmore ¶ 4. It was in the Massachusetts headquarters of Northeast that Plaintiffs were instructed on the allegedly discriminatory pricing plan, and later told that their employment was terminated. *Id.* ¶¶ 4, 15.

Plaintiff Ashmore is a resident of Maine. Northeast Division of Cargill, Inc. has its administrative office in Chelsea, Massachusetts. Affidavit of James Flaherty ¶ 4. Northeast Division has sales offices in Rhode Island, Maine, New Hampshire, Massachusetts, Connecticut, and North Carolina. Affidavit of M.A. Kurschner ¶ 3. Cargill does business worldwide, has its principal place of business in Minnesota, and is incorporated under Delaware law. *Id.*

The *Restatement (Second) of Conflicts* requires an issue-by-issue assessment of a claim to determine the state with the most significant contacts to a particular issue. The central issue for Counts II and IV are what actual or implied promises regarding terms of the employment contract were made from Northeast Division to Plaintiff Ashmore who agreed to represent Northeast in several New England states. The Second Restatement gives particular weight to the place of performance and the place of negotiation in contract cases where they are the same. *Restatement (Second) of Conflicts* § 188(3). Here, although Plaintiff's territory was not limited to a single state, his performance included significant numbers of customers in Massachusetts. Because negotiation of the contract and a substantial part of performance was in Massachusetts as well as all supervisory decisions and training, the Court

24. The written promise which Plaintiff alleges as the basis for the breach of contract and promissory estoppel claims was generated by Cargill, Inc.'s principle office in Minnesota for distribu-

tion to offices of Cargill throughout the United States and, possibly, the world. Affidavit of M.A. Kurschner (Docket No. 12, Exhibit 2) ¶ 6.

concludes that Massachusetts had the most significant contacts with the generation of the issue of what express or implied promises were made by Northeast Division, as raised in Counts II and IV. Moreover, the contract terms allegedly breached, the alleged discriminatory pricing policy, and the discharge were all handled through the activities of the Northeast Division administrative center in Massachusetts.[25] Because Massachusetts had the most significant contacts with respect to Counts II and IV, the Court will not dismiss these claims.

■ The claim based on wrongful termination in violation of public policy (Count V) is a claim based on tort law and, therefore, the relevant factors for choice of law are different. The Second Restatement of Conflicts provides the principles by which Maine courts generally evaluate conflicts of law in tort cases. *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 934 (Me.1982); *Beaulieu v. Beaulieu*, 265 A.2d 610 (Me.1970). In order to determine the state which has the most significant relationship to the occurrence and parties, the following contacts are considered to the extent that they are relevant to a particular issue: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. *Restatement (Second) of Conflicts* § 145.

■ Here the place where the conduct causing the injury occurred as well as the place where the injury occurred was Massachusetts, where Ashmore's employment was terminated. In addition to these two contacts, the relationship between Ashmore and the Defendants was centered in Massachusetts. It was in Massachusetts that the formal employment relationship was negotiated and commenced, where the sales representatives received training, and where Ashmore's supervisors were located. Affidavit of Ashmore ¶¶ 3–5, Affidavit of Flaherty ¶¶ 4, 6. These three factors all point to Massachu-

setts law as having the most significant contacts to the factual generation of the issue of whether a cause of action exists for wrongful discharge in violation of public policy.

The fourth factor does not point to any particular state; Ashmore is a citizen of Maine; Cargill has the strongest ties with Minnesota and Delaware but maintains offices throughout the world, with a major administrative center for the Northeast Division in Massachusetts; and Northeast Division of Cargill has its main administrative offices in Massachusetts. Because the first three contacts are all with Massachusetts, this Court has no difficulty deciding that most significant contacts to this tort claim are with Massachusetts. Therefore, Massachusetts law will be applied to the wrongful discharge claim, and the motion to dismiss this claim will be denied.

### IV. *The Promissory Estoppel Claim*

■ Defendants urge the dismissal of Count III, which is based on promissory estoppel as to all Plaintiffs, for failure to state a cause of action. In order to prevail on this motion pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must be convinced that Plaintiffs could prove no set of facts that would entitle them to relief on a theory of promissory estoppel. Here, Plaintiffs have alleged that they detrimentally relied on Defendants' promise that they would not be required to engage in any but "legal, open, and honest competition." Complaint ¶¶ 39–40. Defendants argue that Plaintiffs have failed to state a claim based on promissory estoppel because they have not alleged "that *absent* the alleged 'promise,' they each would have participated in, and raised no complaint about, the supposedly improper pricing system." In effect, Defendants argue that Plaintiffs have not sufficiently alleged reliance. Defendants cannot prevail on this argument because the clear import of the Complaint is that absent the alleged promise the Plaintiffs would have acted differently.

This Court concludes that these Plaintiffs could potentially prove a set of facts that

---

**25.** Even if the policy decisions were generated in Minnesota, neither negotiation nor performance ties this contract to Minnesota.

would show that absent the "promise," they might have remained silent or proceeded in a different manner. This conclusion is supported by the Plaintiffs' allegations that three Plaintiffs did, in fact, participate in the pricing system when coerced to do so. Under these circumstances, Plaintiffs may be able to prove that they would not have risked their employment by open resistance to the illegal pricing system absent Defendants' promise that they would not be expected to compromise fair and open competition.

Defendants also argue that promissory estoppel is a substitute for "traditional consideration" and, because the Plaintiffs were compensated for their employment, they cannot state a claim based on promissory estoppel. However, Defendants' argument misses the mark. The issue here is not whether Plaintiffs received consideration for their labor, but whether Defendants received consideration for their alleged "promise" not to require sales representatives to engage in anticompetitive activities. If Defendants' promise was supported by consideration, then it forms part of a contract, and Plaintiffs have no need for a claim based on promissory estoppel because they have a claim for breach of contract. The Court assumes, for the purposes of this motion, that Defendants do not intend to concede that the alleged "promise" was supported by consideration. Therefore, the Court concludes that Plaintiffs could potentially prove that, although this promise was not part of a bargained-for exchange but was merely gratuitous, the promise was of the type and formality that would foreseeably induce reliance. For these reasons the motion to dismiss Count V will be denied.

## V.

Accordingly, it is hereby *ORDERED* that Defendants' Motion to Dismiss be, and it is hereby, *DENIED*.