USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-2153 CHARLES W. SULLIVAN, Plaintiff, Appellant, v. PAUL TAGLIABUE, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Breyer,* Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Torruella, Circuit Judge. _____________ ____________________ Joseph L. Alioto with whom Angela M. Alioto, Frederick P. Furth, ________________ _________________ ___________________ Bruce J. Wecker, Michael P. Lehmann and Alan R. Hoffman were on brief ________________ __________________ _______________ for appellant. John Vanderstar with whom Sonya D. Winner, Ethan M. Posner, ________________ _________________ ________________ Jeremiah T. O'Sullivan, Sarah Chapin Columbia, Joseph W. Cotchett and ______________________ ______________________ __________________ Susan Illston were on brief for appellees. _____________ ____________________ June 6, 1994 ____________________ ____________________ *Chief Judge Stephen Breyer heard oral argument in this matter but did not participate in the drafting or the issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. 46(d). COFFIN, Senior Circuit Judge. Plaintiff Charles Sullivan _____________________ brought this action individually and as assignee of the assets of Stadium Management Corporation (SMC) challenging, as an illegal restraint in trade, a National Football League (NFL) Rule prohibiting the sale of shares in an NFL franchise to any company not engaged in the business of professional football, in violation of Sections 1 and 2 of the Sherman Act.1 See 15 ___ U.S.C. 1, 2. The district court held that plaintiff lacked standing to bring this claim and granted summary judgment for defendants.2 After a review of the record, we affirm. ____________________ 1Sullivan also alleged supplemental state law claims of breach of fiduciary obligations, interference with prospective advantageous contract, unfair trade practices, and intentional infliction of emotional distress. When the district court granted summary judgment on the federal antitrust claims, it declined to exercise supplemental jurisdiction over the state law claims. See ___ Sullivan v. Tagliabue, 828 F. Supp. 114, 120 n.6 (D. Mass. 1993). ________ _________ 2Defendants named in this action are the NFL, current NFL Commissioner Paul Tagliabue and his predecessor Pete Rozelle. Paragraph 7 of the complaint also names the following 21 organizations owning NFL franchises: The Five Smiths, Inc.: Indianapolis Colts, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd.; The Detroit Lions, Inc.; Green Bay Packers, Inc.; Houston Oilers, Inc.; Los Angeles Rams Football Co.; Minnesota Vikings Football Club, Inc.; New Orleans Saints LP; New York Jets Football Club, Inc.; B & B Holdings, Inc.; Pittsburgh Steelers, Inc.; Tampa Bay Area NFL Football, Inc.; Pro-Football, Inc.; Chargers Football Co.; and Seattle Professional Football Club, Inc. The caption of plaintiff's complaint names a slightly different set of defendants. It fails to include either the Los Angeles Rams Football Co. or the Charges Football Co. as defendants, and adds the New York Football Giants, Inc. to the list. -2- I. Factual Background. __________________ Charles Sullivan (plaintiff or Sullivan) is the former owner and sole stockholder of SMC, which owned the stadium where the New England Patriots play their games. His father, William Sullivan, was the Patriots' owner at all relevant times. In 1987, William Sullivan sought to sell a 49% interest in the Patriots to an investment banking firm not in the business of football, which, in turn, was to sell the shares to the public. Through this transaction, plaintiff, through SMC, expected to obtain financing for his stadium. Under the terms of the NFL Constitution and By-Laws, member teams are not permitted to sell shares to the public unless three-fourths of the members approve. William Sullivan was unable to persuade the other NFL owners to allow his proposed deal, and in October 1988, he instead sold the team to a private buyer. In February 1988, SMC filed a Chapter 11 petition in bankruptcy, and the stadium subsequently was sold for the "bargain basement price" of $25 million. In May 1991, William Sullivan sued the NFL, alleging that its policy against public ownership violated the federal antitrust laws because it unreasonably restrained trade in ownership interests in NFL teams.3 Charles Sullivan filed this lawsuit several months later against the NFL and other parties ____________________ 3On October 22, 1993, a jury awarded William Sullivan $38 million, which was reduced by the district court upon motion by the defendants to $17 million, before trebling. The NFL defendants have appealed this verdict. -3- allegedly responsible for enforcing the challenged rule. He claims that, had the public offering of Patriots' stock been permitted, SMC would have received a $40 million dollar loan from the investment banking firm that would have been used to pay off debts and to make significant renovations to the stadium. In addition, in 1987, the stadium held a lease with the Patriots which extended until 2002, which Sullivan alleges would have been extended for 20 years had the sale of the Patriots stock gone through. Finally, he claims, the NFL policy prevented the Patriots from making their own investment in the maintenance of the stadium, thus undermining SMC's ability to keep the Patriots from breaking their lease with SMC and moving to another location.4 As damages, plaintiff claims the amount of the enhanced market value of the stadium that would have resulted from the planned renovations and the lease extension. ____________________ 4During the bankruptcy proceedings, plaintiff received an assignment of all SMC's causes of action in consideration of the release of claims against SMC by plaintiff. The NFL argues that Sullivan, as SMC's assignee, is precluded from pursuing its antitrust claims against the NFL defendants because SMC did not disclose these claims during the course of the bankruptcy proceedings. They contend that, at least by October, 1990, when he entered into a stipulation with the bankruptcy trustee resolving claims by and against him, Sullivan was fully aware of all of the facts upon which his complaint is based and that his antitrust claims should have been raised in the bankruptcy proceedings. In their view, SMC is therefore estopped from bringing a legal action to enforce the claims against the NFL defendants. For the purposes of this decision, we assume, without deciding, that SMC is not estopped from bringing a legal action to enforce these claims. -4- The district court granted summary judgment for defendants, holding that Sullivan lacked antitrust standing. The court reached this conclusion by determining that the materials submitted indisputably showed that the injury plaintiff suffered was not within the type contemplated by the antitrust laws; that its impact was too indirect; and that the damages claimed were too speculative. Plaintiff now appeals. Our review of a grant of summary judgment is plenary. Mendes v. Medtronic, Inc., 18 F.3d 13, 15 (1st Cir. 1994). ______ _______________ II. General Principles of Antitrust Standing ________________________________________ Sullivan asserts that under Section 4 of the Clayton Act, 15 U.S.C. 15(a) (1994), he has standing both individually and on behalf of SMC to maintain a private damage action against the NFL. Under Section 4, "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found . . . without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee."5 This statutory language is broad, conferring the right to sue on "any person" claiming an injury causally related to an ____________________ 5It is unquestioned that the requirements of antitrust standing exceed those of standing in a constitutional sense. See ___ Associated General Contractors, Inc. v. California State Council ____________________________________ _________________________ of Carpenters, 459 U.S. 519, 535 n.31 (1977); see also Daniel _____________ ___ ____ Berger & Roger Bernstein, An Analytical Framework for Antitrust ______________________________________ Standing, 86 Yale L.J. 809, 813 n.11 (1977). ________ -5- antitrust injury. However, the class of persons entitled to recover damages under Section 4 has been limited by caselaw through the doctrine of "antitrust standing." See Associated ___ __________ General Contractors of California, Inc. v. California State ___________________________________________ _________________ Council of Carpenters, 459 U.S. 519, 529-35 (1983); Blue Shield _____________________ ____________ of Virginia v. McCready, 457 U.S. 465, 472-73 (1982). ___________ ________ In Associated General Contractors, the Supreme Court _________________________________ outlined a series of factors to be evaluated on a case-by-case basis to determine whether a plaintiff has standing to bring an antitrust action.6 These factors are: (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative ____________________ 6Prior to Associated General Contractors, circuit courts had _______________________________ crafted a variety of tests to determine whether a party injured by an antitrust violation had standing to bring an action for treble damages under Section 4 of the Clayton Act. The two most commonly stated tests focused on the "directness of the injury" to the alleged antitrust violation, and whether a plaintiff was in the "target area" of the antitrust conspiracy. See Associated ___ __________ General Contractors, 459 U.S. at 535-36 & n.33 (citations ____________________ omitted); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, _____________ 334.1 (1993 Supp.). A third test considered whether the injury was "`arguably within the zone of interests protected by the antitrust laws.'" Associated General Contractors, 459 U.S. at _______________________________ 536 n.33 (citation omitted). In Associated General Contractors, ______________________________ the Court, noting that it was "virtually impossible to announce a black-letter rule that will dictate the result in every case," 459 U.S. at 536, drew on these tests to outline a series of factors to guide courts in deciding whether a private plaintiff should have standing to pursue an antitrust action in a particular case. See id. at 536-46. ___ ___ -6- nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages. 459 U.S. at 537-45; See ___ also Lovett v. General Motors Corp., 975 F.2d 518, 520 (8th Cir. ____ ______ ____________________ 1992) (listing factors). Though Associated General Contractors outlined a ___________________________________ comprehensive approach to the question of antitrust standing, it gives little guidance as to how to weigh the various factors, and whether the absence of a particular factor would be fatal to standing in every instance. In Associated General Contractors _______________________________ itself, the Court found that two factors, the causal connection between the Union's alleged injuries and the violation of the antitrust laws, and the allegation of improper motive, supported a grant of standing, 459 U.S. at 537, but that a consideration of the remaining relevant factors weighed heavily against standing, id. at 545. The Court concluded that, in the circumstances of ___ that case, these latter factors were controlling, and denied standing to the plaintiffs. Id. at 545-46. ___ We draw from the Court's discussion in Associated General __________________ Contractors the requirement that courts consider the balance of ___________ factors in each case in an effort to guard against "engraft[ing] artificial limitations on the 4 remedy." McCready, 457 U.S. at ________ 472. See also Los Angeles Memorial Coliseum v. NFL, 791 F.2d, _________ ______________________________ ___ 1356, 1363 (9th Cir. 1986) ("Most cases will find some factors tending in favor of standing . . . , and some against . . . , and a court may find standing if the balance of factors so instructs."); accord Southaven Land Co. v. Malone & Hyde, Inc., ______ ___________________ ____________________ -7- 715 F.2d 1079, 1085-86 (6th Cir. 1983); Ashmore v. Northeast _______ _________ Petroleum Corp. of Cape Cod, 843 F. Supp. 759, 765 (D. Me. 1994). ___________________________ III. Application to Claims Brought on Behalf of SMC ______________________________________________ A. Factors Supporting Standing ___________________________ Sullivan argues that the district court was correct when, evaluating the relevant factors as they applied to claims brought on behalf of SMC, it found that plaintiff had alleged, and presented evidence of, a causal connection between the alleged antitrust violation and the harm to the plaintiff, and an improper motive on the part of defendants; and when it found no significant risk of duplicate recoveries or danger of complex apportionment in this case. He maintains, however, that the court erred in its determination that the absence of the remaining Associated General Contractors factors required the ________________________________ court to deny standing. He contends that he has satisfied the remaining factors, and that the court should have granted him standing to press his antitrust suit, both individually and on behalf of SMC. We agree that the district court correctly found that Sullivan's complaint met three of the Associated General ___________________ Contractors factors. Sullivan alleged, and presented evidence, ___________ of a causal connection between the application of the NFL Rule and SMC's inability to refinance the stadium because the sale of Patriots' stock to the public was prohibited. Sullivan also alleged an improper motive on the part of defendants in that they "sought to restrain and monopolize interstate commerce in -8- professional football" and took the actions they did in furtherance of that goal. In addition, Sullivan indicated that defendants intended to block the refinancing of the stadium by their actions, or, at the very least, that such a harm was a foreseeable consequence of the application of the Rule to the Patriots.7 Nor does there appear to be a significant risk of duplicate recovery or danger of complex apportionment in this case, as the injuries of which Sullivan complains are sufficiently distinct from those alleged by William Sullivan, the only other plausible litigant in this case.8 B. Factors Defeating Standing __________________________ We are not persuaded, however, by Sullivan's argument that he satisfies the remaining Associated General Contractors' _________________________________ factors. The existence of antitrust injury is a central factor in the standing calculus.9 In this case, its absence, together ____________________ 7Of course, as the Supreme Court has noted, the presence of an improper motive on the part of the defendants is not, by itself, determinative of antitrust standing. See Associated General ___ __________________ Contractors, 519 U.S. at 537 & n.37 (noting that "[t]he ___________ availability of the 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators") (quoting McCready, 457 U.S. at 479). ________ 8We recognize that there is a risk of duplicate recovery and complex apportionment of damages as between Sullivan, in his individual capacity, and SMC, in light of their seemingly overlapping injuries. We think that this can be avoided, however, given that plaintiff brings this single action for damages suffered by both. 9Some courts have concluded that a consideration of antitrust injury is of threshold significance in the Section 4 standing inquiry. See, e.g., Balaklaw v. Lovell, 14 F.3d 793, 797-98 & ___ ____ ________ ______ n.9 (2d Cir. 1994); Todorov v. DCH Healthcare Authority, 921 F.2d _______ ________________________ 1438, 1449 (11th Cir. 1991); see also State of South Dakota v. ___ ____ ______________________ -9- with the indirectness of the injury to Sullivan, and the speculative nature of the claimed damages, outweighs the remaining factors. We therefore conclude that plaintiff lacks standing to pursue the claims brought on behalf of SMC. 1. The Nature of the Injury: Is it Antitrust Injury? _________________________________________________ Sullivan contends that he has suffered "antitrust injury," that is, the type of injury that the antitrust laws were designed to prevent. He relies principally on McCready, 457 U.S. at 465, ________ and Los Angeles Coliseum, 791 F.2d at 1356, to support this _____________________ claim. The Supreme Court first articulated the concept of "antitrust injury" in Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 _______________ _________________ U.S. 477 (1977). In Brunswick, several small bowling centers _________ brought suit, challenging the acquisition of several of their competitors by the much larger Brunswick Corporation as an anticompetitive merger under Section 7 of the Clayton Act, 15 U.S.C. 18, and seeking treble damages under Section 4 for ____________________ Kansas City Southern Industries, 880 F.2d 40, 46 (8th Cir. 1989) ________________________________ (noting primacy of antitrust injury requirement). Cf. Cargill, ___ ________ Inc. v. Montfort of Colorado, Inc., 479 U.S. 104, 110, n.5 (1986) ____ __________________________ (pointing out, in the course of considering antitrust injury requirement for private plaintiffs seeking an injunction under Section 16 of the Clayton Act, that a showing of antitrust injury was a necessary (though not always sufficient) element of standing to sue for damages under Section 4). We agree that the absence of antitrust injury weighs heavily against a grant of standing. We need not consider, however, whether this should be fatal to standing in every instance, because in the circumstances of this case, we conclude that the balance of factors as a whole weighs against a grant of standing. -10- profits they would have made had the acquired centers gone out of business. Id. at 480-81. ___ Although plaintiffs had alleged that Brunswick had engaged in predatory practices designed to lessen competition in the markets it had entered, they could prove only that Brunswick's acquisitions had deprived them of profits they would have made had the acquired firms closed. Id. at 488, 490 & nn.15, 16. The ___ Court noted that, in essence, plaintiffs were not complaining that Brunswick's actions had reduced competition, but preserved it, thereby depriving plaintiffs of the benefits of increased concentration. Id. at 488. Rejecting the lower court's holding ___ that any loss "causally linked" to "the mere presence of the violator in the market" was compensable, id. at 486-87, the Court ___ found that plaintiffs' injury was not of "`the type the [antitrust laws] were intended to forestall,'" 429 U.S. at 487-88 (citation omitted). The Court held that to recover treble damages under Section 4, a plaintiff must prove "antitrust _________ injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Id. at 489 (emphasis in original). ___ In Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982), _______________________ ________ the first case explicitly to address antitrust standing, the Court incorporated a focus on "antitrust injury" into its Section 4 standing inquiry. The plaintiff in McCready was a subscriber ________ of Blue Shield, a health insurance plan that did not provide reimbursement for psychotherapy treatment rendered by -11- psychologists (unless "prescribed" by and billed through a medical doctor), while providing reimbursement for the same treatment if given by a psychiatrist. McCready was treated by a psychologist, and Blue Shield refused to reimburse her for this treatment. McCready brought suit, alleging that Blue Shield and an association of psychiatrists had engaged in an unlawful conspiracy "`to exclude and boycott clinical psychologists from receiving compensation under'" the Blue Shield plans, and that Blue Shield's failure to reimburse was in furtherance of this conspiracy. McCready, 457 U.S. at 470. ________ The defendants argued that McCready had not suffered "antitrust injury" because her injury did not reflect the anti- competitive effect of the alleged antitrust violation. Id. at ___ 481-82. McCready had not paid inflated fees for psychotherapy to psychiatrists, the supposed beneficiaries of the conspiracy; nor had she alleged that her psychologists' bills were higher than they would have been had the conspiracy not existed. Id. at 481. ___ The Court, however, refused to so limit recovery. While not a competitor of the conspirators, the injury McCready suffered -- sanction in the form of the unreimbursed psychologists' services -- "was inextricably intertwined with the injury the conspirators sought to inflict" on the market. Id. at 483-84. McCready ___ suffered injury by virtue of the role she played in Blue Shield's anticompetitive scheme. Denying reimbursement to patients of psychologists was the "very means" by which Blue Shield coerced -12- her to choose between becoming an unwilling participant in its illegal campaign to boycott the services of psychologists, or to pay the costs of treatment for the therapist of her choice from her own pocket. The harm to McCready was thus a "necessary step in effecting the ends of the alleged illegal conspiracy." Id. at ___ 479. The Court therefore found that McCready's injury "`flow[ed] from that which makes defendants' acts unlawful,' within the meaning of Brunswick," falling "squarely within the area of _________ congressional concern." Id. at 484. ___ Sullivan argues that the logic of McCready supports his ________ standing. In Sullivan's view, the NFL rule at issue affected competition in the market for football stadia by preventing SMC from obtaining refinancing to pay for renovations that would have led the Patriots to extend their lease, and by interfering with the Patriots' capacity to invest money in the maintenance of their stadium, thus undermining SMC's ability to keep the Patriots from breaking their lease with SMC and moving to another location. Further, the injury to SMC was "inextricably intertwined" with that to the owner of the New England Patriots, since SMC expected to benefit from a joint proposal to conduct a public offering of a minority ownership in the team; and was an "integral aspect" of the conspiracy against the owner of the Patriots and was likely to result from the implementation of that conspiracy. Like McCready, Sullivan claims, neither the fact that SMC stood in a vertical relationship to the intended victim of the -13- alleged antitrust violation (purchasers of NFL franchises), nor the fact that SMC's injuries might be characterized as "indirect" deprive SMC of standing. Likewise, Sullivan's failure to show an increase in price or a lessening of supply in the stadia market, and the fact that Sullivan's personal losses might be derivative of those suffered by SMC are not dispositive. Sullivan points out that McCready's losses, for example, were at least in part derivative of those suffered by her employer, who as the direct purchaser of the group health insurance from Blue Shield, presumably did not get the benefit of its bargain with Blue Shield. We disagree that McCready favors Sullivan's right to sue. ________ Sullivan is correct that McCready did stand, in part, for the ________ Court's refusal to limit recovery to those whose injuries result from the anti-competitive effect of the violation, and to extend available recovery at least to some parties who stand in vertical relationship (such as customers) to the direct victim of an antitrust violation.10 Thus, the fact that SMC was not a competitor in the market for professional football teams, the direct victim of the alleged antitrust violation, but in the related market for football stadia, does not by itself mean that ____________________ 10In this respect, we disagree with defendants' argument that SMC, merely by virtue of its status as the Patriots' landlord, is necessarily barred from bringing suit for injury to its tenant. Whether a landlord has standing to sue for injury to its tenant depends, in part, on the relationship of the landlord to the relevant market and to the antitrust violation. For example, a landlord may have standing to sue for injuries to a tenant based on its status as a competitor in an adjacent market, see Los ___ ___ Angeles Coliseum, 791 F.2d at 1363-65. ________________ -14- he lacks standing here. See McCready at 472 (refusing to engraft ___ ________ artificial constraints on Section 4, stating that "`the statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers'") (internal citation omitted). The circuits are split, however, over the question of whether a plaintiff must be either a consumer or competitor in the market harmed by the antitrust violation at issue in order to establish antitrust injury. Some courts have held that a plaintiff may establish antitrust injury by proof that he was a consumer or competitor in the relevant market, or by showing that __ his injury was "inextricably intertwined" with the injury to competition, in that the plaintiff was "`manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographic market.'" Province v. Cleveland Press Pub. Co., 787 ________ _________________________ F.2d 1047, 1052 (6th Cir. 1986) (quoting Southaven, 715 F.2d at _________ 1086); see Ostrofe v. H.S. Crocker Co., Inc., 740 F.2d 739, 745- ___ _______ ______________________ 46 (9th Cir. 1984) (though neither a consumer nor competitor in the relevant market, fact that injury to plaintiff was a necessary means to achieve the conspirators' illegal end sufficient to establish antitrust injury); Ashmore v. Northeast _______ _________ Petroleum Division of Cargill, 843 F. Supp. 759, 769-70 (same); _____________________________ -15- Donahue v. Pendleton Woolen Mills, 633 F. Supp. 1423, 1435-39 _______ _______________________ (S.D.N.Y. 1986) (following Ostrofe).11 _______ Other courts have interpreted Supreme Court caselaw and the antitrust laws more narrowly, holding that a plaintiff must be a market participant in order to establish antitrust injury. See ___ Bichan v. Chemetron Corp., 681 F.2d 514, 519 (7th Cir. 1982) ______ ________________ (Section 4 protects only parties injured as customers or competitors in a defined market, or in a discrete area of the economy); see also Winther v. DEC International, Inc., 625 F. ___ ____ _______ ________________________ Supp. 100, 102-03 (D. Colo. 1985). We need not resolve this conflict, because even under a broad reading of McCready, SMC ________ cannot support its claim of antitrust injury. Read broadly, McCready extends antitrust standing to parties ________ who can establish that their injury was a "necessary step" and the "means" employed by the conspirators to achieve their illegal ends, regardless of the parties' direct market participation. See McCready, 457 U.S. at 479, 484 n.21; Ostrofe, 740 F.2d at ___ ________ _______ 745-46; Ashmore, 843 F. Supp. at 768-70 & nn.16, 18. Unlike _______ McCready and her co-plaintiffs, neither Sullivan nor SMC were "necessary" instruments to effectuate the alleged conspiracy. Denying stadium refinancing was not a "necessary step" in ____________________ 11These courts reason that the injury suffered by a plaintiff used as a means to effect an antitrust violation is within the core of Congressional concern underlying the antitrust laws, which is "to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions and would provide ample compensation to the victims of antitrust violations." Ashmore, 843 F. Supp. at 770 (quoting _______ McCready, 457 U.S. at 472); see also Ostrofe, 740 F.2d at 746-47. ________ ___ ____ _______ -16- restraining competition in the market for professional football franchises, nor the "very means" by which the defendants sought to do so. Indeed, according to plaintiff's own complaint, the purpose of the NFL policy was to "exclude competitive entry into the business of professional football by . . . television companies, motion picture producers, investment bankers, owners of other professional sports teams, home entertainment companies, and entertainment companies generally." The policy is not alleged to have a similar anticompetitive effect on stadia. Moreover, the instruments of the alleged conspiracy were the NFL and member club owners, not Sullivan or SMC. Nor does the Ninth Circuit's holding in Los Angeles Coliseum ____________________ bolster Sullivan's claim that he suffered antitrust injury. In that case, the Los Angeles Coliseum and the Oakland Raiders attempted to negotiate a deal to relocate the Raiders to Los Angeles to play in the Coliseum (the Rams' old home field), following the Rams' move to Anaheim. In its effort to block this move, the NFL invoked a league rule requiring three-fourths of the member teams to approve a team's relocation into another team's league territory. The Coliseum and the Raiders brought suit, claiming that this was an unlawful restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. 1. A jury found that the NFL rule violated the antitrust laws, and awarded damages to both the Coliseum and the Raiders. In holding that the Coliseum had standing to bring this antitrust action, the court found that the Coliseum had suffered -17- "antitrust injury," because the NFL had "restrained competition . . . among football stadia by restraining the Raiders['] attempt to move and operate in Los Angeles." 791 F.2d at 1364 (emphasis _______ in original). Had the Raiders been permitted to move to Los Angeles, the Coliseum would have been able to bid effectively to have them as a tenant. The rule restraining such a move, the court held, was precisely of the type that the antitrust laws were designed to prevent. Id. ___ The rule at issue here posed no similar restraint on SMC's capacity to compete for a pro football team's tenancy. In fact, in 1987, the year of the attempted sale, SMC and the Patriots had a lease that ran until the year 2002, regardless of the team's ownership. -18- 2. Directness of the Injury ________________________ Sullivan argues that SMC suffered direct harm as a result of the NFL's restraints on the stadia market. He maintains that Los ___ Angeles Coliseum supports this claim, and compares SMC's status ________________ to that of the Coliseum. In Los Angeles Coliseum, the Coliseum had been engaged in a ____________________ bidding struggle with a rival stadium for the tenancy of the Oakland Raiders when the NFL's invocation of its restrictive relocation rule foreclosed further negotiations, thus depriving the Coliseum of expected revenue for leasing the facility to the Raiders for their games. 791 F.2d at 1365. The Ninth Circuit concluded that the NFL's illegal territorial restraints directly and foreseeably restrained competition in the stadia market, in which the Coliseum participated, and that the harm it suffered was a direct result of the NFL's illegal territorial restraints. Id. ___ In an attempt to limit the reach of this holding, the court stated that it was "confident that [this] ruling will not be misinterpreted as being a broad endorsement of antitrust standing for all parties who might have contracted with the Raiders had they not been restrained in their relocation plans. Football stadia constitute a special market distinguished from those comprised by, say, hotels, laundering establishments, or limousine services, by their indispensable and intimate connection with professional football and football teams. An injury such as that suffered by the Coliseum in the present case -19- cannot be characterized fairly as an indirect `ripple effect.'" Id. at 1365. ___ Sullivan seems to argue that since SMC, like the Coliseum, is a participant in the market for football stadia, it enjoys similar distinguished status by virtue of its "indispensable and intimate connection with professional football and football teams," and should be able likewise to recover. The injury to SMC, and its relation to the rule at issue in this case, are, however, clearly distinguishable. The rule at issue in Los Angeles Coliseum affected where a ____________________ _____ team could be located. In precluding a team from relocating in a particular area, the rule necessarily restrained competition in the related market for football stadia. Once the NFL invoked its rule to block the Raiders from moving into the Rams' territory, the Coliseum (and, indeed, all other stadia in that location) was barred from competing with other stadia for the Raiders' tenancy. The rule at issue in this case had no similar direct effect on SMC, nor on the market in which it was a participant. Plaintiff claims that the NFL rule restricting public ownership of NFL teams was the "but for" cause of the loss of his stadium, injuring SMC as follows: the NFL rejected William Sullivan's plan to sell 49% of his stock to an investment bank, which, in turn, would sell the stock to the public; as a result, SMC did not get refinancing; SMC therefore could not pay its debts, nor complete renovations; SMC could not get an extension on its lease (which was contingent on the sale of Patriots' stock), and was forced to -20- file for bankruptcy. We think that any injury suffered by SMC as a result of the NFL rule was indirect, and a consequence of the direct injury inflicted on the Patriots' owner. In addition, the fact that William Sullivan, the party most directly harmed by the alleged violation, has pursued (and indeed, obtained a verdict in) his own antitrust action diminishes another possible rationale for allowing Sullivan to proceed in this case. See Associated General Contractors, 459 ___ _______________________________ U.S. at 542 (existence of an identifiable class of persons whose self-interest likely to motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party to sue).12 3. Speculative Nature of the Damages _________________________________ ____________________ 12Contrary to plaintiff's assertion, the district court's finding that there was no significant risk of duplicative recoveries or danger of complex apportionment of damages is not at odds with its determination that the fact that William Sullivan was pursuing his own antitrust action weighed against a grant of standing. In considering the risk of duplicativeness and complex apportionment of damages, courts are concerned with keeping antitrust actions within judicially manageable limits by curtailing litigation involving apportionment of damages among an array of parties claiming injury. See Associated General ___ ___________________ Contractors, 459 U.S. at 543-45 & nn.50-51; see also Southaven, ___________ ___ ____ _________ 715 F.2d at 1087. In considering directness, courts are concerned with the question of which among the affected parties are most likely to be motivated to pursue an antitrust action. While in the usual case, this would be those most directly affected by the antitrust violation, in some cases, more remote parties might be more likely to detect and pursue an antitrust action. See Associated General Contractors, 459 U.S. at 542; see ___ ______________________________ ___ also Ashmore, 843 F. Supp. at 766-67 (appropriate to grant ____ _______ standing to employees discharged for refusal to implement discriminatory pricing system, because purchasers, though directly damaged by anticompetitive effect of violation, are least likely to discover it). -21- The district court found that "[g]iven that an extended chain of independent events would have had to have occurred to give credence to the Plaintiff's damages claim on behalf of SMC," the damages claims were "at best, highly speculative." 828 F. Supp. at 118. Sullivan claims that damages to SMC are measurable in terms of the enhanced market value of the stadium which would have resulted from the planned renovations, the extension of the lease with the Patriots, and the potential for deals with promoters for other entertainment and sports events. We think that calculating these damages would "necessitate wide ranging speculation," Southaven Land Co., 715 F.2d at 1088, about the ___________________ future value of a refinanced, renovated, debt-free stadium with a new lease. Because the harm to SMC was indirect, and was caused, in part, by independent intervening factors (notably, its prior serious indebtedness, as well as its failure to secure additional sources of commercial financing), we agree with the district court that SMC's damages claims are "highly speculative," and are an additional factor weighing against a grant of standing in this case. See Associated General Contractors, 459 U.S. at 542 ___ ________________________________ (finding that damages were speculative because injury was indirect, and because it may have been produced by independent intervening factors). The Ninth Circuit's holding in Los Angeles Coliseum is not ____________________ to the contrary. In that case, the estimated damages claimed by the Coliseum included claims for lost profits that would have been earned had luxury stadium boxes been built in the Coliseum -22- and rented for the 1980 football season. 791 F.2d at 1366. The court noted these estimates may have been unfounded due to lack of proof of causation. Id. Nonetheless, the court upheld the ___ damages award, holding that even without considering the elements in question (lost profits from would-have-been luxury boxes), there was sufficient evidence, including attendance and seat price estimates offered by the Raiders, to uphold the total award of damages. Id. ___ Los Angeles Coliseum is distinguishable in several important ____________________ respects. As the Ninth Circuit found, the Coliseum suffered direct harm as a result of the NFL's antitrust violation: but for the NFL's interference in its negotiations with the Raiders, the Coliseum likely would have secured their tenancy. Id. at 1365. ___ The damages suffered were therefore intimately connected with the antitrust violation. Moreover, losses based on attendance and ticket price estimates were the foreseeable result of these damages, and are precisely the type of damages courts can calculate easily. By contrast, the asserted harm here is indirect, and likely the result, at least in part, of independent intervening factors; nor is the enhanced market value of a refinanced, renovated, debt-free stadium with a new lease easy to calculate. It is the combination of these factors that leads us to conclude that any damages to SMC as a result of the alleged antitrust violation are highly speculative. See Associated ___ __________ General Contractors, 459 U.S. at 542. ___________________ -23- Having considered the relevant Associated General ____________________ Contractors' factors, we conclude that the balance in this case ____________ weighs against a grant of standing. We therefore conclude that Sullivan may not pursue an antitrust action on behalf of SMC. IV. Application to Sullivan's Personal Damages Claims _________________________________________________ Sullivan also claims that the NFL's restrictive rule directly damaged him in his individual capacity, by charging him with an array of expenses arising out of the SMC bankruptcy, including the payment of legal and other professional fees associated with the bankruptcy proceeding itself, lost opportunity to purchase debt at a discounted rate, lost compensation and benefits, and anguish and emotional distress. In that, as the district court found, these damages "merely flow from the alleged injuries to SMC," 828 F. Supp. at 120, they are that much further removed from the injuries claimed on behalf of SMC. We therefore conclude, consistent with our conclusion that SMC did not suffer "antitrust injury," and that any damages suffered were too indirect and speculative to sustain an action on its behalf, that Sullivan likewise lacks standing to pursue an antitrust action for damages suffered in his individual capacity. The decision of the district court is AFFIRMED. ______________________________________________ -24-