**BEYLEN COMMUNICATIONS, INC.;**
**Loma International Communication,**
**Inc., Plaintiffs,**

v.

**TEMPEST ASSOCIATES, INC.;** Nathan Schwartzbaum; David Gotchalk; Telefonica Larga Distancia; Puerto Rico Communications Corp.; Carlos O. Rodriguez; Puerto Rico Telephone Co., Defendants.

Civil No. 95–1899(SEC).

United States District Court,
D. Puerto Rico.

Dec. 4, 1996.

---

**5.** Madon did not object to the defendants' motion to dismiss his § 1983 claim against the school district.

Rafael F. Ojeda–Colón; Calle Sagrado Corazón, Santurce, PR, Miguel E. Bonilla–Sierra; San Juan, PR, for Plaintiffs.

Danilo M. Eboli–Martínez, Axtmayer, Adsuar Muñiz & Goyco Law Offices, San Juan, PR, for Defendants.

### OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court is the motion to dismiss filed by codefendants Puerto Rico Telephone Company, Puerto Rico Communications Corporation and Carlos O. Rodriguez, (**Docket #17**). After a careful analysis of the applicable law and the parties' arguments, the defendants' motion to dismiss is **GRANTED**.

### Factual Background

When deciding a motion to dismiss, the Court assumes that plaintiff's allegations are true and draws all reasonable inferences from these asseverations in their favor. *Correa–Martinez v. Arrilaga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990). Pursuant to this doctrine, we proceed to recount the basic allegations proffered by plaintiffs' complaint. Plaintiffs in the present action Beylen Communications, Inc., ("Beylen"), Loma International Communications, Inc. ("Loma") filed a suit against Puerto Rico Telephone Company ("PRTC"), Telefonica Larga Distancia, Inc. ("TLD"), and Puerto Rico Communications Corporation ("PRCC"), Tempest Associates, Inc. ("Tempest"), and assorted officers of the above mentioned corporations.

Beylen is a New York corporation which at the time of the alleged tortious conduct acted as an information provider, operating telephone lines for entertainment purposes with a 900 prefix, a system managed from its New York offices. Beylen contracted for the services of co-plaintiff Loma to serve as business representative, partner and liaison in Puerto Rico. Loma's duties comprised, *inter alia*, taking care of pertinent billing and collection of the services to be provided, via 900 lines, together with the local telephone billing companies in Puerto Rico.

Plaintiffs alleged that they entered into a contractual arrangement with TLD where defendant would procure certain services for the transport and handling of telephone calls, through long-distance telephone lines identified with a 900 prefix, including the corresponding billing and collection. Such contractual relationship depended as well on a prior contractual relationship between TLD and codefendants Puerto Rico Telephone Company/Puerto Rico Communications Company (PRTC/PRCC), so that TLD would act as an interexchange carrier, capable of providing the 900 calls services in Puerto Rico. PRTC/PRCC, alleges plaintiffs, was indispensable for the rendering of said services, affording the network and telephone system

to originate the calls as well as for the corresponding billing and collection systems.

The Beylen/Loma 900 entertainment line systems in Puerto Rico was designed to operate as follows: i) Beylen/Loma procured, at their cost, the publication of advertisement in the Puerto Rico media, offering the entertainment services and identifying the talent, the cost per minute and the telephone numbers with a 900 prefix which the users had to call to access the services; ii) the user, a subscriber of PRTC/PRCC, using the telephone network (DDD) of the latter, originated a long distance telephone call from Puerto Rico pursuant to the instructions specified in the different ads; iii) the calls were routed to and answered in destinations in the continental United States, being attended by the different talents, as announced; iv) TLD, as the long-distance carrier, recorded the time consumed by the user and sent said information to PRTC/PRCC to be processed and accounted based on the price per minute agreed between the parties TLD/Loma and as so announced to the general public; v) Beylen/Loma had the independent capacity to corroborate the call count and time consumed by users of their 900 entertainment systems; vi) as part of the monthly telephone billing sent by PRTC/PRCC the users received a statement which reflected the minutes spent in the Beylen/Loma 900 line system together with total dues owed; vii) these users were under the obligation to pay their monthly 900 services bills together with the regular payment of the monthly telephone bills; viii) upon collection, PRTC/PRCC transferred monies to TLD (after retaining its agreed upon fees), and TLD then transferred monies to Beylen/Loma.

Although the arrangement proceeded amicably during the first year of operations, plaintiff alleges that PRTC/PRCC and TLD started to breach their contractual obligations, such as unjustifiably withholding some of the monies owed Beylen/Loma and then committing substantial billing errors. At the beginning of 1994, PRTC/PRCC and TLD requested the payment of approximately $300,000 to comply with requirements imposed by the Federal Communications Commission (FCC) and the Federal

Trade Commission (FTC) according to new regulations implementing the Telephone Disclosure and Dispute Resolution Act (TDDRA), implemented retroactively as of November 1, 1993. Defendants emphasized a particular requirement of written notice to each potential subscriber/user of the 900 entertainment lines services, (more than 900,-000 subscribers) whereby they had to be informed in English and Spanish of several details pertaining to the operation of the 900 entertainment lines industry. Among these requirements, the plaintiffs had to advise their subscribers that the regular telephone service could not be disconnected for not paying his/her 900 entertainment line billing.

Plaintiffs allege that defendants placed a particularly onerous burden of compliance on them, since they required plaintiffs to notify their subscribers through the mail in an independent manner, not together with any monthly billing. Furthermore, they offered to undertake the notification on plaintiffs' behalf at a substantially larger fee than the fee offered another competitor, codefendant Tempest, allegedly the dominant participant on the market. Plaintiffs add that defendants failed to negotiate in good faith to promote an equitable solution to enable Loma/Beylen to comply with the new federal regulations.

After defendants refused to cooperate in the settlement of their dispute regarding the notifications, defendants disconnected Beylen/Loma's 900 entertainment lines on February 28, 1994, thereby excluding said companies from the market. Plaintiffs allege that other competitors in the Puerto Rico entertainment lines services industries were also disconnected, with the sole exception of codefendant Tempest. Despite repeated attempts to re-enter the market in Puerto Rico, plaintiffs allege that they have been rebuffed at every turn.

Pursuant to these events, plaintiffs filed a complaint in this Court, alleging violations of the Sherman Act, 15 U.S.C. §§ 1, 2, 3 and the Clayton Act, 15 U.S.C. §§ 4, 15, as well as a violation of the Puerto Rico Antitrust Act, 10 L.P.R.A. § 258, 260, 265, 268, breach of contract, and tortious interference with

contractual relations, pursuant to Article 1802 of the Civil Code of Puerto Rico.

### Applicable Law/Analysis

█ The court must determine whether an information service provider and its alleged agent incur an "injury" within the meaning of the antitrust laws when their "900" entertainment services lines are disconnected by a local exchange carrier for their refusal to pay their pro rata share of the costs of a statutorily mandated notice to the carrier's subscribers, and advise them of their rights regarding the billing and collection procedures for calls made to those 900 services.

Defendants argue, and this Court agrees, that such an entity does not suffer an antitrust injury and that accordingly, plaintiffs cannot bring suit under §§ 1, 2, 3, 4 and 15 of the Sherman/Clayton Act, 15 U.S.C. § 15, as amended.

Plaintiffs allege that the defendants' conduct harms or threatens harm in the provision of information services for entertainment purposes offered in Puerto Rico via long distance telephone lines with a 900 prefix. Assuming that this was a proper "relevant market" for antitrust purposes. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), the presumptively "proper" plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market. *Associated General Contractors of California, Inc. v. Carpenters*, 459 U.S. 519, 539–540, 103 S.Ct. 897, 909–910, 74 L.Ed.2d 723 (1983); *SAS of Puerto Rico v. Puerto Rico Telephone Co.*, 48 F.3d 39, 44 (1st Cir. 1995).

As noted by defendants PRTC and PRCC, plaintiffs are not suing in either capacity, and do not have standing to bring an antitrust action.[1] Neither Beylen nor Loma are callers who might use PRTC or PRCC's lines for long distance service in Puerto Rico. Neither Beylen nor Loma were seeking access to PTRC's or PRCC's network for its "services" in competition with the primary providers, PRTC or PRCC.

█ A private plaintiff may not recover damages under § 4 of the Clayton Act merely by alleging "injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Instead, a plaintiff must prove the existence of "antitrust injury" that is, an injury of the type [which] antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. *Id.*

In *Cargill, Inc. v. Monfort of Colorado Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court reiterated that injury, although causally related to an antitrust violation, nevertheless will not qualify as "antitrust injury" unless it is attributable to an anti-competitive aspect of the practice under scrutiny, "since [i]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition." Id. at 109–110, 107 S.Ct. at 488–489. (quoting *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697).

Section 4 of the Clayton Act, 15 U.S.C. § 15, broadly identifies those "persons" entitled to pursue an antitrust action:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained....

█ Upon initial review, section 4 "[o]n its face contains little in the way of restrictive language," *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 102 S.Ct. 2540, 2544–45, 73 L.Ed.2d 149 (1982), and consistent with congressional intent, the federal forum must guard against "engraft[ing] artificial limitations on the § 4 remedy." Id. at 472, 102 S.Ct. at 2544–45. However, the application of § 4 has of necessity been judicially tailored to limit the remedy available thereunder to particular classes of persons and for redress of particular forms of injury. *Associated General Contractors of California, Inc. v. California State Council of Car-*

---

**1.** The requirements of antitrust standing exceed those of "standing" in a constitutional sense.

Associated General Contractors, 459 U.S. at 535, n. 31, 103 S.Ct. at 907, n. 31.

*penters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).[2]

Courts have sought to strike an uneasy balance between the judicial limitation of the § 4 remedy to those persons and injuries within the core of congressional concern, and the avoidance of "artificial limitations" of the facially unrestrictive § 4 remedy.

■ The Supreme Court addressed this issue in *Associated General Contractors of California, Inc. v. Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 An examination of the legislative history of § 4 compelled the Supreme Court to conclude that "Congress simply assumed that the antitrust damages litigation would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation." 459 U.S. at 533, 103 S.Ct. at 906. The judicially created doctrines which limited the availability of damages at the time that Congress enacted § 4 included concepts of foreseeability, proximate cause, directness of injury, certainty of damages and privity of contract. 459 U.S. at 532–533, 103 S.Ct. at 905–906. The issue of whether a § 4 plaintiff "may recover for the injury it allegedly suffered" requires the federal court, as mandated in common law damages litigation from the 1890s, to "evaluate the plaintiffs' harm, the alleged wrongdoing by the defendants, and the relationship between them." Id at 535, 103 S.Ct. at 907.

The Court noted that the § 4 inquiry differed substantially from the traditional "standing" analysis:

> The label antitrust standing has traditionally been applied to some of the elements of this inquiry. As commentators have observed, the focus of the doctrine of "antitrust standing" is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determina-

tion whether the plaintiff is a proper party to bring a private antitrust action. 459 U.S. at 535, note 31, 103 S.Ct. at 907, note 31.

■ In *Sullivan v. Tagliabue,* 25 F.3d 43, 46 (1st Cir.1994), the First Circuit applied the principles of antitrust standing delineated by the Supreme Court in *Associated General Contractors.* In *Sullivan,* the First Circuit outlined the six relevant factors: (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws; 4) the directness with which the alleged market restraint caused the asserted injury; 5) the speculative nature of the damages; and 6) the risk of duplicative recovery or complex apportionment of damages. *Sullivan,* 25 F.3d at 46. The Court noted that the balancing of these factors to confer or deny standing require a case-by-case analysis, with no particular factor being dispositive. Id.

In the present case, plaintiff alleges that PRTC and PRCC monopolized, attempted to monopolize, conspired to monopolize, and conspired to restrain trade by engaging in the following conduct:

1) withholding amounts of monies allegedly owed to the plaintiffs that had been collected from PRTC and PRCC subscribers for the use of the plaintiffs' "services." Complaint, ¶ 19;

2) incurring in billing and collection errors, and giving the Puerto Rico legislature incorrect information of the 900 entertainment lines "industry." Complaint, ¶ 20;

3) insisting that the plaintiffs pay in excess of $300,000.00 to comply with notice requirements recently imposed by the Federal Communications Commission and the Federal Trade Commission under new regulations implementing the Telephone Disclosure and

---

2. "the lower federal courts have been 'virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation' ... An antitrust violation may be expected to cause ripples

of harm to flow through the Nation's economy; but 'despite the broad wording of §4 there is a point beyond which the wrongdoer should not be held liable.' " Associated General Contractors, 459 U.S. at 534–535, 103 S.Ct. at 906–907.

Dispute Resolution Act. ("TDDRA"), Complaint, ¶ 22;

4) demanding immediate compliance with the requirements imposed by the law and regulation based on their "particular interpretation" in an amount that was not commensurate with the plaintiffs' share of the market. Complaint, ¶ 23; and

5) disconnecting the 900 lines used by the plaintiffs due to their refusal to comply with the law and regulations. Complaint, ¶ 29.

■ A significant element of the § 4 "standing" inquiry is the nature of the plaintiffs' alleged injury either as a "customer" or "participant" in the "relevant market":

> In this case it is appropriate to focus on the nature of the plaintiff's alleged injury. As the legislative history shows, the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market. *Associated General Contractors,* 459 U.S. 519, 103 S.Ct. 897.

■ However, a finding that plaintiff is or is not a direct participant in the relevant market does not dispose of the § 4 "standing" issue. In *Blue Shield of Virginia v. McCready* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Supreme Court noted that an injury "inextricably intertwined" with the injury sought to be inflicted upon the relevant market or participants therein may fall "within the area of congressional concern" so as to satisfy the § 4 inquiry.

Nevertheless, in the case before us, plaintiffs' injury cannot be construed as "inextricably intertwined," within the meaning of *McCready,* with the injury allegedly inflicted by PRTC and PRCC upon the relevant market, so as to make plaintiffs' injury "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *McCready,* 457 U.S. at 483, 102 S.Ct. at 2550–2551, (citing *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. at 697–698). Plaintiffs have not, and cannot allege to be members of a class of "consumers" of the product or a class otherwise manipulated or utilized by PRTC or PRCC as a "fulcrum, conduit or market force" to injure competitors or participants in the relevant product and geographical markets.

Although plaintiffs' injury, if any, may be a tangential by-product of PRTC's or PRCC's legally monopolistic conduct, such injury is not "inextricably intertwined" to any injury inflicted upon the relevant market. Accordingly, neither plaintiff is a consumer, customer or competitor in the true relevant market otherwise intertwined with any such entity. Their injury is not sufficiently linked to the pro-competitive policy of the antitrust laws.

■ Another factor which the Court must evaluate to determine antitrust standing is the "existence of more direct victims" of the alleged antitrust violation. *Associated General Contractors* at 545, 103 S.Ct. at 912. More direct victims may justify denial of a § 4 remedy to those only tangentially injured since such "is not likely to leave a significant antitrust violation undetected or unremedied." *Id.* at 542, 103 S.Ct. at 911. Since plaintiffs are neither consumers nor competitors in the relevant market, it follows that they are seeking to vindicate the rights of other, more direct victims of the defendants' alleged tortious conduct. Indeed, the plaintiffs so admit in their opposition to the motion to dismiss. (Docket # 30, p. 23) Plaintiffs seek to rebut this argument by noting that "[i]t is doubtful that any individual consumer of long-distance pay-per-call service would have the economic incentive to institute costly antitrust litigation ... Beylen is the 'preferred private attorney general' ... whose self-interest would normally motivate [it] to vindicate the public interest in antitrust enforcement." *Pennsylvania Dental Ass'n v. Medical Service Ass'n of Pennsylvania,* 815 F.2d 270, 277 (3rd Cir.1987). Such argument fails to sway the Court. There does not seem to be any indication in the present case that a class of consumer could not initiate their own cause of action.

■ Although plaintiffs also allege that defendants' conduct was prompted by an improper motive to displace plaintiffs from the market, we do not find this factor tilts the scales in plaintiffs favor. The Supreme Court noted that "an allegation of improper

motive, although it may support a plaintiff's damages claim under § 4, is not a panacea that will enable a complaint to withstand a motion to dismiss." *Associated General Contractors*, 459 U.S. at 537, 103 S.Ct. at 908. In our particular case, plaintiffs admit that defendants relied on the notice requirements imposed by recent federal regulations to eventually disconnect their services. Although we must consider all of plaintiffs' allegations as true, the Court is not compelled to credit bald assertions or mere specious allegations. Such is the present case with regards to plaintiffs' allegations of improper motive. Plaintiffs' allegations, reasonably interpreted, present a scenario of a contractual relationship gone awry, rather than a Machiavellian effort by defendants to undermine plaintiffs' stronghold on the entertainment services industry in Puerto Rico. In view of these facts, the "improper motive" factor counsels against conferring antitrust standing upon plaintiffs in the present case.

Another element that Courts must acknowledge in the antitrust standing inquiry is the "directness or indirectness of the asserted injury." Id. 459 U.S. at 540, 103 S.Ct. at 909. Indirect injuries may render damages highly speculative or create situations of complexity that would foreclose an equitable determination and apportionment of damages.

■ As noted by Fed.R.Civ.P. 8, and the standard of review on motions to dismiss, the Court must liberally construe plaintiffs' complaint. With this in mind, plaintiffs' allegations may support the inference that plaintiffs have been injured in their ability to monopolize without constraint the "substantial participation in the Puerto Rico 900 entertainment line' service" that they claim to have enjoyed. (Complaint, ¶¶ 21, p. 11) However, plaintiffs base their injury upon diminished consumer interest in, and activity at, its area as a result of consumer preference for a competitor who later entered the market. They also allege an inability to realize high income from subscriber calls. Given this context, the Court would need to engage in broad speculation, especially since diminished consumer activity at any given area could result from a plethora of indepen-

dent reasons unrelated to the alleged antitrust violation. *Associated General Contractors*, 459 U.S. at 542, 103 S.Ct. at 910–11.

Additionally, plaintiffs' injury is remediable under other laws, which plaintiffs readily admit in their own complaint. (See plaintiffs' complaint, causes of action five through ten, based on state law) *Associated General Contractors*, 459 U.S. at 543, 103 S.Ct. at 911.

Upon careful balancing of these factors, the Court concludes that plaintiffs are not proper plaintiffs under § 4 of the Clayton Act or the Sherman Act, and accordingly the complaint must be **dismissed.** In view of the above discussion, defendants' motion to dismiss is **GRANTED.** (Docket # 17)

■ This Court also declines to exercise jurisdiction over plaintiffs' remaining state claims against the defendants. This Court feels that these claims, if colorable, could properly be adjudicated in the local courts of Puerto Rico. "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." *Rodríguez v. Doral Mortgage Corp.*, 57 F.3d 1168 (1st Cir.1995); *see also Martinez v. Colón* 54 F.3d 980, 990 (1st Cir.1995) (affirming dismissal without prejudice of pendent claims when the district court determined "far in advance of trial that no legitimate federal question existed.")

Accordingly, plaintiffs' state-law claims against defendants are also **DISMISSED WITHOUT PREJUDICE.** In view of this dismissal, we also **dismiss without prejudice** defendants' counterclaim, **(Docket # 42)** to enable them to pursue their claims in state court, if they so desire. Judgment shall be issued accordingly.

**SO ORDERED.**