March 1, 1995
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1711

SAS OF PUERTO RICO, INC.,

Plaintiff, Appellant,

v.

PUERTO RICO TELEPHONE COMPANY,

Defendant, Appellee.

ERRATA SHEET ERRATA SHEET

The opinion of this Court issued on February 21, 1995, is amended
as follows:

On page 8, line 18, the word "pendant" should be "supplemental".

On page 10, note 2, the footnote should read: "Illinois Brick
Co. v. Illinois, 431 U.S. 720 (1977). Compare Hanover Shoe, Inc. v.
United Shoe Mach. Corp., 392 U.S. 481 (1968).".

Page 10, note 4, line two of note, "Brunswich" should be
"Brunswick".

UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT

No. 94-1711

SAS OF PUERTO RICO, INC.,

Plaintiff, Appellant,

v.

PUERTO RICO TELEPHONE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jose Antonio Fuste, U.S. District Judge]

Before

Torruella, Chief Judge,

Boudin, Circuit Judge,

and Boyle,* Senior District Judge.

Laurence Z. Shiekman with whom M. Duncan Grant, Frank M.
Rapoport, Michael A. Ceramella and Pepper, Hamilton & Scheetz were on
brief for appellant.
Philip J. Mause with whom Joaquin A. Marquez and Drinker Biddle &
Reath were on brief for appellee.

February 21, 1995

*Of the District of Rhode Island, sitting by designation.

BOUDIN, Circuit Judge. SAS of Puerto Rico, Inc.

("SAS"), brought an antitrust suit in federal district court

in Delaware against Puerto Rico Telephone Company ("PRTC").

After the suit was transferred to the district court in

Puerto Rico, the district court granted PRTC's motion to

dismiss on the ground that SAS did not adequately assert

"antitrust injury." We agree and affirm.

I.

In April 1993 SAS filed its original complaint in

Delaware district court. After the case was transferred to

Puerto Rico, the site of most of the events that underlie the

case, an amended complaint was filed. Since the amended

complaint was later dismissed on the pleadings, we accept the

allegations as true for purposes of this appeal. Berkovitz

v. United States, 486 U.S. 531, 540 (1988). What follows is

SAS's version of the facts, supplemented by information not

reasonably disputable.

PRTC is a Delaware corporation that provides about 90

percent of the telephone service within Puerto Rico and

operates over 95 percent of the pay phones in Puerto Rico.

Although once a subsidiary of ITT, all of the stock of PRTC

was acquired about 20 years ago by the Puerto Rico Telephone

Authority ("the Authority"), a public corporation and

government instrumentality of the Commonwealth. The

Authority also owns the stock of the Puerto Rico

-2- -2-

Communications Corporation ("PRCC") which provides telephone

service and operates pay phones in those areas of Puerto Rico

not served by PRTC. (PRTC's brief says that it and PRCC have

now merged.)

Long distance service between Puerto Rico and the U.S.

mainland was for some years provided by an ITT subsidiary

interconnecting on the mainland with AT&T, but in the 1980's

the Federal Communications Commission took steps to

facilitate competition for Puerto Rico's long distance

traffic.1 To participate in this new environment, the

Authority created yet another wholly owned subsidiary called

Telfonica Larga Distancia ("TLD"). In 1990, the Commonwealth

adopted legislation designed to facilitate the Authority's

sale of TLD's stock.

After its formation, TLD rapidly became the carrier for

about 80 percent of the long distance telephone calls made

from pay phones in Puerto Rico. Although the mechanics are

not described in the complaint, they can readily be inferred.

Pay phones are commonly located on streets or other public

property by the local telephone company or they may be

located on private property such as in a store or hotel

lobby; in the latter instance, the instrument is usually



1E.g., All America Cables & Radio, Inc. v. FCC, 736 F.2d
752 (D.C. Cir. 1984); Common Carrier Facilities Off of the
Island of Puerto Rico, 2 F.C.C.R. 6600 (1987), on recons.,
FCC 92-529 (1992).

-3- -3-

(although not always) furnished by the local telephone

company by arrangement with the property owner.

As long distance competition developed over the past

three decades, telephone subscribers have ordinarily been

able to select the long distance carrier through which their

calls would be routed. A small percentage of modern pay

phones make it easy for the caller to select his or her

preferred long distance carrier by pushing a single button;

but in many pay phones, a pre-designated long distance

carrier automatically receives the traffic unless the caller

"dials" a complex access code to reach another long distance

carrier.

According to the complaint, in Puerto Rico many of the

pay phones used (or were connected through) older technology

that prevented a caller from using a long distance carrier--

other than the pre-designated one--except by the cumbersome

means of calling an operator and asking to be routed to a

different long distance carrier. The pre-designated carrier

for a pay phone is normally selected by the local telephone

company or the premises owner. In short order TLD began to

carry most of the long distance calls from Puerto Rico pay

phones.

SAS was formed as a Puerto Rico corporation in 1991 in

the hope of contracting with PRTC and PRCC to upgrade

equipment and maintain service at Puerto Rico's pay phones.

-4- -4-

The complaint explains that "[t]he principals of SAS were

experienced in the installation and operation of `intelligent

paystations' and, in fact, had successfully assisted in

improving the pay phone system in the United States Virgin

Islands." Such intelligent pay phones, embodying what are

effectively computers, can provide various advantages to

callers (e.g., speed dialing) and to the local telephone

company (e.g., remote diagnosis of failure).

The intelligent pay phones to be supplied by SAS would

also increase competition among long distance carriers. SAS

expected to negotiate with such carriers, as agent for the

local telephone company or premises owner, presumably to

secure the most favorable terms for the position of pre-

assigned long distance carrier at the pay phone. In addition

the intelligent pay phone would greatly simplify the task of

the caller who desired to route his or her own call through a

long distance carrier other than the pre-assigned carrier.

On January 31, 1992, after "substantial negotiation and

investment of considerable time and money," SAS signed an

"agency agreement" with both PRTC and PRCC to provide and

maintain pay telephones in Puerto Rico. As to PRTC, the

agreement provided for SAS to act as PRTC's agent to upgrade

a minimum of 1,500 of PRTC's pay phones at tourist and

business centers. The agreement included authority for SAS

to negotiate with the premises owner to alter the pre-

-5- -5-

designated long distance carrier for the intelligent pay

phones to be installed on the premises. SAS hoped to obtain

better terms from such carriers through competition.

Ten days after the January 31 agreement, the Authority

reached an agreement with Telefonica de Espana, the

international subsidiary of Spain's telephone company, to

sell it control of TLD. Part of the value of TLD lay in its

position as the pre-designated long distance carrier at most

of Puerto Rico's pay phones. This position was threatened by

the SAS-PRTC agreement. According to the complaint, PRTC

thereafter "engaged in a course of conduct designed to delay,

disrupt and derail the installation of the 1,500 intelligent

paystations in Puerto Rico."

The complaint does not describe this conduct beyond

asserting generally that PRTC failed to carry out unspecified

obligations under the contract while making new demands on

SAS. On June 18, 1992, SAS agreed with PRTC and PRCC to

modifications in the original agreement and shortly

thereafter PRTC told SAS to proceed with installation. SAS

then obtained a $500,000 line of credit and began to purchase

the new pay phone equipment. In October 1992 PRTC told SAS

to stop operations. More negotiations followed and a second

contract revision followed, but after further steps by SAS to

implement the program, SAS was again instructed to halt work.

-6- -6-

In April 1993, SAS began the present lawsuit in the

district court in Delaware, PRTC's state of incorporation.

The complaint (as later amended) says that after the case

began, PRTC in late 1993 or early 1994 sought bids to replace

some or all of the pay phones that SAS had contracted to

replace; PRTC later accepted one of the bids; and PRTC

thereafter contracted for pay phones with some of the same

manufacturers or suppliers who had agreed to supply them to

SAS when the latter was seeking to fulfill its own contract

with PRTC.

The complaint alleges, in its first three counts, that

the acts described constituted monopolization and attempted

monopolization of two different markets and conspiracy to

restrain trade in the same markets, all in violation of the

Sherman Act. 15 U.S.C. 1-2. PRTC was alleged to have

monopoly power in "the market for the provision of pay phone

service in Puerto Rico"; and PRTC, PRCC and TLD as a "single

economic entity" were alleged to have such power in "the

market for the provision of long distance service from pay

phones in Puerto Rico."

In the antitrust conspiracy count Telefonica de Espana

was named as a co-conspirator. In addition to the conduct

already described, SAS alleged that PRTC had discussed with

Telefonica de Espana the impact that the SAS upgrading of pay

phones would have and that PRTC had impeded and delayed the

-7- -7-

agreement with SAS in order to avoid an adverse impact on the

value of TLD.

Additional counts of the complaint charged PRTC with

fraud, breach of contract, and tortious interference with

contracts between SAS and makers or suppliers of pay

stations. On the antitrust counts, the complaint sought

injunctive relief, treble damages and attorney's fees; on the

non-federal counts, it asked for compensatory damages and

attorney's fees. In the injunctive relief request, SAS asked

that PRTC be required to complete its contract with SAS.

After the transfer to Puerto Rico, SAS of Puerto Rico v.

Puerto Rico Tel. Co., 833 F. Supp. 450 (D. Del. 1993), PRTC

moved to dismiss the antitrust claims on the ground that it

was protected by the state action doctrine, see Parker v.

Brown, 317 U.S. 341 (1943), or, in the alternative, that

antitrust injury had not been alleged. PRTC also contended

that it was shielded from damage liability for antitrust

violations by the Local Government Antitrust Act of 1984, 15

U.S.C. 34-36. In an opinion and order entered May 9,

1994, the district court rejected the state action and

statutory arguments but dismissed the antitrust claims for

lack of antitrust injury.

Having found that SAS had failed to state a claim under

the antitrust laws, the district court declined to exercise

supplemental jurisdiction under state law as to the fraud,

-8- -8-

contract and tortious interference claims. See 28 U.S.C. 

1367. An order was entered dismissing the complaint, and

this appeal followed. Because we agree with the position on

antitrust injury taken in the district court's opinion, we

confine our discussion to that issue.

-9- -9-

II.

Despite its statutory framework, antitrust law is

largely the handiwork of federal judges and antitrust

enforcers, and the resulting case law offers much to admire.

The corner of antitrust law with which we are concerned here

is an exception. As one commentator has observed, "the

courts have never been able to create an intelligible theory

of private antitrust standing capable of being applied across

the full range of potential cases." H. Hovenkamp, Federal

Antitrust Policy 543 (1994). Cf. Associated General

Contractors v. Carpenters, 459 U.S. 519, 536 (1983) (no black

letter rule).

The underlying problem is not unique to antitrust law.

Common law tort claims have been limited by various slippery

rubrics (e.g., proximate cause), so that not everyone

remotely harmed by a violation is entitled to recover. From

the outset, federal antitrust courts have devised counterpart

limitations under various headings (e.g., standing, antitrust

injury) and through a variety of subordinate rules (e.g.,

restrictions on suits by stockholders or indirect

purchasers), metaphors (e.g., "inextricably intertwined,"

"target area"), abstractions (direct versus remote injury),

and multi-factor tests. See Associated General Contractors,

459 U.S. 519; Sullivan v. Tagliabue, 25 F.3d 43 (1st Cir.

1994).

-10- -10-

One reason for the confusion in antitrust cases is that

courts sometimes have difficulty, well justified in certain

cases, in separating standing or antitrust injury issues from

two other problems: whether there has been an antitrust

violation at all, and whether the plaintiff has suffered any

injury causally (in the "but for" sense) related to the

challenged conduct. Standing or antitrust injury involves a

different concept: even where a violation exists and a

plaintiff has been damaged by it, the courts--for reasons of

prudence--have sought to limit the right of private parties

to sue for damages or injunctions.

The prudential concerns, however, are multiple, and the

variety of situations endless. One set of limitations has

been based on fear of duplicative recovery and excessively

complex litigation.2 Another is concerned with the

remoteness of the injury and the speculative character of the

injury or the connection.3 Another set reflects an

unwillingness to award antitrust damages to one who suffered

from pro-competitive or irrelevant effects of an otherwise



2Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).
Compare Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392
U.S. 481 (1968).

3Associated General Contractors, 459 U.S. at 543; Hawaii
v. Standard Oil Co., 405 U.S. 251, 262-63 n.14 (1972).

-11- -11-

anticompetitive transaction.4 These elements sometimes

overlap; and the list is not exhaustive. It is not

surprising that no simple rule has emerged for choosing the

best antitrust plaintiff and deciding when second-best

plaintiffs should be barred.

Nevertheless, there are patterns in the antitrust

standing cases that offer considerable guidance. One of

those patterns involves the supplier who suffers because an

antitrust violation curtails a business that would otherwise

have purchased from the supplier. In general such a supplier

(including an employee who supplies labor) is held not to

have suffered "antitrust injury"; while there may be a

violation and causal harm to the supplier, the failed

business is the immediate victim and the preferred plaintiff.

II P. Areeda & H. Hovenkamp, Antitrust Law 375 (rev. ed.

1995) (collecting numerous cases).

This is not because suppliers are automatically improper

antitrust plaintiffs; a seller may well have a claim if

victimized by a price-fixing ring composed of buyers that

lowered the market price: in such a case the seller is a

participant in the very market where competition is impaired.

But if the supplier's customer fails because of an antitrust

violation, usually the conduct was deemed an antitrust



4Cargill v. Montfort of Colorado, 479 U.S. 104 (1986);
Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477
(1977).

-12- -12-

violation because of the threat to the customer, not the

supplier.

Here, the situation is not quite parallel: SAS was not

injured because its customer failed due to an antitrust

violation by a third party; rather, the customer (PRTC) in

the course of its own violation allegedly breached its

agreement to use SAS as a supplier. But if the breach played

a part in an antitrust violation, the conduct itself was an

antitrust violation because of the anticompetitive threat

posed to other potential plaintiffs, not SAS. Like the

happenstance supplier to a customer felled by a violation,

SAS was coincidentally involved.

SAS's complaint alleged that PRTC's conduct harmed or

threatened harm to competition in two different markets: the

provision of pay phone service in Puerto Rico and the

provision of long distance service from such pay phones.

Assuming arguendo that either or both is a proper "relevant

market" for antitrust purposes, Spectrum Sports v. McQuillan,

113 S. Ct. 884, 892 (1993), the presumptively "proper"

plaintiff is a customer who obtains services in the

threatened market or a competitor who seeks to serve that

market. Associated General Contractors, 459 U.S. at 538-39.

SAS is not suing in either capacity.

SAS was not a premises owner aiming to obtain a better

pay phone in its hotel or restaurant, or a caller who might

-13- -13-

use such a pay phone for ordinary or long distance service.

Nor was SAS a competitor seeking access to the network for

its pay phones in competition with the primary provider,

PRTC; SAS' aim was to supply such phones to or for PRTC.

Finally, despite some vague allusions in its brief, nothing

in the complaint suggests that SAS was, or was about to

become, a long distance carrier who might be benefitted by

easier customer access.

SAS argues that the district court failed to give it the

benefit of a favorable reading of its complaint, and that it

is entitled to such a reading. It says, in particular, that

the district court chose to characterize the wrong as a

simple contract claim rather than viewing it as a potential

antitrust claim as well. Certainly, an individual act of

misconduct can be the gravamen of more than one wrong to a

single plaintiff. Not every antitrust claim in a contract

case is simply a contract claim masquerading as a candidate

for treble damages.

But the problem here is not that a plaintiff is

automatically limited to one cause of action. It is that the

central conduct here involved--PRTC's failing to carry

through a plan to broaden access--is wrongful as to SAS only

insofar as it may be a common (or civil) law wrong. Insofar

as the same conduct is also an antitrust violation, that

violation does not infringe any interest of SAS protected by

-14- -14-

the antitrust laws. This is almost certainly all that the

district court meant in saying that SAS's claim was really

one for breach of contract.

If competitors and consumers are favored plaintiffs in

antitrust cases, the list of those presumptively disfavored

is far longer. The list of those who may be derivatively

injured, but are usually denied standing to sue includes

"employees of the violator, and stockholders, creditors,

landlords, and employees of victims." Hovenkamp, supra, at

554. It is hardly surprising to afford similar treatment to

an incidentally injured supplier to a victim or, as here, the

supplier to a supposed violator. But "presumptively" does

not mean always; there can be exceptions, for good cause

shown. See generally Sullivan, 25 F.3d at 49.

The most obvious reason for conferring standing on a

second-best plaintiff is that, in some general category of

cases, there may be no first best with the incentive or

ability to sue. Cf. Associated General Contractors, 459 U.S.

at 542. That is hardly likely here: those threatened by the

market injury alleged by SAS include various potential

plaintiffs, above all, long distance carriers, who should

have ample incentive and ability to challenge violations that

foreclose their access to customers. If there is any other

reason for stretching to confer standing in this case on an

-15- -15-

incidentally connected plaintiff like SAS, it does not occur

to us.

We have concerned ourselves thus far primarily with the

question whether SAS is a competitor or consumer in the

market threatened by the alleged violation or has any other

protectable interest under the antitrust law. But there is a

second element in the antitrust standing cases that works

against SAS in this case. As already noted, one of the

reasons for limiting standing concerns the speculative

character of either the injury or the relationship between

the violation and injury. This concern may operate even in

cases, like this one, where no duplicative recovery is

threatened. Sullivan, 25 F.3d at 52.

At first blush it may seem as if PRTC's antitrust

violation, if violation it was, clearly deprived SAS of

whatever profits it might have made by carrying through the

contract. But more carefully identifying the supposed

violation raises substantial doubts. Assuming arguendo that

PRTC had or assumed some duty under the antitrust laws to

upgrade its pay phones, it is not clear that the breach of

that duty is meaningfully connected to the failure to carry

through the contract with SAS.

After all, supposing that the antitrust laws impose on

PRTC a duty to upgrade, they certainly do not require that

the upgrading be done by SAS or any other specific vendor.

-16- -16-

SAS would have been no less damaged if PRTC had breached the

contract but installed improved pay phones of its own on the

same timetable, thereby enhancing long distance competition.

Conversely, once SAS got the contract and PRTC then allegedly

breached it, SAS faced injury--but the injury would have

existed even if no antitrust violation arose from the failure

to upgrade. Thus, the connection here between "antitrust"

and "injury" is suspect in more ways than one.

It remains to say something about the Supreme Court's

decision in Blue Shield v. McCready, 457 U.S. 465 (1982), on

which SAS relies heavily throughout its brief. There, by a

five-to-four decision, the Supreme Court held that a consumer

of health services could sue under the antitrust laws to

redress a supposed conspiracy, between her insurance plan and

Virginia psychiatrists, to exclude psychologists from

receiving compensation under the plan. Although not the

immediate target of the supposed boycott, McCready herself--a

plan beneficiary who had used a psychologist and been denied

reimbursement--was held to have standing under the antitrust

laws.

In language much stressed by SAS, the Supreme Court said

that McCready's injury "was inextricably intertwined with the

injury the conspirators sought to inflict on psychologists

and the psychotherapy market." 457 U.S. at 484. McCready is

also useful to SAS for a larger reason, namely, that it may

-17- -17-

be an instance in which standing was extended to a plaintiff

who was only derivatively injured, there by an alleged

boycott directed against psychologists for the benefit of

psychiatrists. But McCready can also be read as a case in

which the plaintiff was a purchaser in the very market

directly distorted by the antitrust violation, see Areeda &

Hovenkamp, supra, 364f, something that cannot even arguably

be said of SAS.

Thus, the only real link between McCready and the

present case is the very general "inextricably intertwined"

language of the former. It is doubtful that this language--

if taken as physical image--was ever intended as a legal test

of standing. Quite apart from difficulties in application,

such a test would certainly be very hard to square with the

longstanding limitations on claims by stockholders, employees

and even indirect purchasers. Nothing in McCready suggests

that it intended to overrule those limitations even though it

would be very easy to describe such injuries as inextricably

intertwined in the ordinary suggestive sense of the phrase

In all events, the Supreme Court simply reinterpreted

the phrase as a legal conclusion in Associated General

Contractors, saying (after a reference to the phrase): "In

this case [Associated General Contractors], however, the

Union was neither a consumer nor a competitor in the

[restrained] market . . . ." 459 U.S. at 539. It did the

-18- -18-

same thing more recently in Atlantic Richfield v. USA

Petroleum Co., 495 U.S. 328, 345 (1990) (injury not

"inextricably intertwined" because competitor not injured by

"the anticompetitive effects" of the challenged conduct). We

do not think that anything more need be said about the

matter.

III.

Having assumed throughout that an antitrust violation

may have occurred, it is prudent to stress that this

assumption is very much open to debate; the purported

"essential facilities" doctrine is something less than a

self-executing formula.5 We have also supposed the

existence of causation of harm "in fact", see Sullivan v.

NFL, 34 F.3d 1091, 1103 (1st Cir. 1994); but for reasons

suggested at the end of our standing discussion, a serious

question exists whether the alleged "antitrust violation"--

when more carefully defined--can be described as the but-for

cause of the harm suffered by SAS.

In all events, even where there is a harm-causing

antitrust violation, not every injured party is entitled to

claim under the antitrust laws. In this case, supposing an

antitrust violation occurred, it was not a violation directed

against SAS and SAS is not an appropriate plaintiff to obtain



5See generally Interface Group, Inc. v. Massachusetts
Port Auth., 816 F.2d 9, 12 (1st Cir. 1987) (Breyer, J.);
Hovenkamp, supra, 7 (critiquing the doctrine).

-19- -19-

antitrust relief. SAS's remedies, if the allegations of the

complaint are true, lie in contract and the other pertinent

non-federal claims asserted in its complaint.

Affirmed. 

-20- -20-